2023 IL App (4th) 210630

NOS. 4-21-0630, 4-22-0017, 4-22-0018 cons.

FILED
August 14, 2023
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Vermilion County |
| OCHEIL D. KEYS, | ) | Nos. 17CF725 |
| Defendant-Appellant. | ) | 19CF732 |
| | ) | 19CF733 |
| | ) | |
| | ) | Honorable |
| | ) | Nancy S. Fahey, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justices Lannerd and Knecht concurred in the judgment and opinion.

## OPINION

¶ 1        Following a jury trial, defendant, Ocheil D. Keys, was convicted of the following

offenses: first degree murder (720 ILCS 5/9-1(a)(1) (West 2016)) and concealment of a homicidal

death (720 ILCS 5/9-3.4(a) (West 2016)) in case No. 17-CF-725, dismembering a human body

(720 ILCS 5/12-20.5(a) (West 2016)) and concealment of a homicidal death (720 ILCS 5/9-3.4(a)

(West 2016)) in case No. 19-CF-732, and dismembering a human body (720 ILCS 5/12-20.5(a)

(West 2016)) and concealment of a homicidal death (720 ILCS 5/9-3.4(a) (West 2016)) in case

No. 19-CF-733. Defendant was sentenced to an aggregate of 96 years' imprisonment. The cases

were consolidated for appeal. On appeal, defendant argues (1) he was not proved guilty of first

degree murder beyond a reasonable doubt, (2) numerous instances of ineffective assistance of trial counsel, (3) a violation of his right to a speedy trial as to the charges brought in 2019, and (4) one conviction for dismembering a human body and two convictions for concealment of a homicidal death must be vacated because the legislature did not permit multiple convictions under the relevant statutes. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3            On October 22, 2017, defendant and the victim, Barbara Rose, shared a romantic relationship. Rose lived with her two daughters, ages 18 and 8, in a single-family home in Danville. Rose's adult sons, Trent and Trai, lived in their own homes but visited Rose frequently. Though defendant maintained his own residence, he stayed with Rose. On October 24, 2017, Trent reported Rose missing to the police. No one had seen or heard from Rose since October 22, 2017. On October 29, 2017, the police arrested defendant for Rose's murder.

¶ 4                                    A. The 2017 Information

¶ 5            On October 31, 2017, the State charged defendant by information with six counts of first degree murder (alleging various theories of murder and that defendant personally discharged the firearm that caused Rose's death) and one count of concealment of a homicidal death in case No. 17-CF-725. The concealment charge alleged as follows:

> "[Defendant] on or about the 22 day of October, 2017, with knowledge that [Rose] had died by homicidal means, knowingly concealed the death of [Rose] by transporting her body from the place of her death and hid or otherwise disposed of her remains, in violation of 720 ILCS 5/9-3.4 (a)."

¶ 6                                    B. The 2019 Indictments

¶ 7        On December 20, 2019, a Vermilion County grand jury indicted defendant on one count of dismembering a human body and one count of concealment of a homicidal death in case No. 19-CF-732. The dismembering count alleged that defendant, "on or about" the twenty-third to the twenty-sixth day of October 2017, "knowingly mutilated the deceased body of [Rose], by use of fire." The concealment count alleged that defendant, "on or about" the twenty-third to the twenty-sixth day of October, 2017, "knowingly concealed the death of [Rose] by moving her body to the property near 1519 Lyons St. Danville, IL, with knowledge that [Rose] had died by homicidal means."

¶ 8        On December 20, 2019, a Vermilion County grand jury also charged defendant with one count of dismembering a human body and one count of concealment of a homicidal death in case No. 19-CF-733. The dismembering count alleged that, "on or about the 27th to the 29th day of October 2017," defendant knowingly "dismembered, severed, and separated body parts from the deceased body of [Rose]." The concealment count alleged that, "on or about the 27th to the 29th day of October 2017," defendant knowingly concealed Rose's death by "placing [Rose's] body parts in a sock and bag and placed them into a 2000 Pontiac Grand Prix, with knowledge that [Rose] had died by homicidal means."

¶ 9        On the State's motion, the 2017 and 2019 charges were tried together. The jury trial commenced on July 19, 2021.

¶ 10                          C. The Evidence at Trial

¶ 11                          1. *Rose Vanishes*

¶ 12        We will include additional facts as necessary in the analysis section of this opinion. On October 24, 2017, defendant informed Trent and Trai that Rose had been missing for two days. Defendant said Rose went to Peru, Indiana, with a friend on Sunday, October 22, to buy a car and

- 3 -

never returned home. On the evening of October 24, 2017, Trent reported Rose missing to the police. In the ensuing days, Rose's family searched for her. Defendant did not participate in those searches.

¶ 13    Jennifer Veatch testified that at about 11 p.m. on Saturday, October 21, 2017, she and Rose agreed to meet the next day. According to Veatch, Rose said nothing about going to Indiana to buy a car. The next day—Sunday—Veatch began texting Rose at about noon, but Rose never responded.

¶ 14    Ebonnie Bryant testified she saw Rose on October 22, 2017, at approximately 3 a.m. when she dropped her baby off at Rose's house for Rose to babysit while Bryant went out. Bryant testified defendant contacted her around 11 a.m. and asked her to pick up her baby. Brytney Harrier testified she went to Rose's house at about 11:30 a.m. to pick up Bryant's baby. According to Harrier, defendant handed her the baby through the front door without "welcoming" Harrier inside the house. Harrier testified that defendant said they had a "vicious" dog. Harrier testified she was familiar with Rose's dog and never knew it to be vicious.

¶ 15    Rhonda Crippin testified she was defendant's girlfriend in October 2017. Crippin testified she did not know about Rose until she learned the woman was missing. According to Crippin, defendant came to her home on the evening of Sunday October 22, 2017. Crippin described defendant's behavior as normal. Crippin testified defendant spent most of the following week with her. Crippin testified that on the only night defendant did not spend with her, he asked her for a lighter. Crippin testified she thought that request was odd because defendant did not smoke.

¶ 16    Defendant's cousin, Lennie Strader, testified that on Monday, October 23, 2017, defendant wanted to borrow Strader's truck. Strader refused to loan the truck to defendant. Alfreda

Luster, defendant's mother, testified defendant borrowed her 2000 Pontiac Grand Prix on the Saturday after Rose disappeared and returned it on Sunday. Luster testified there was "nothing unusual" in the car when defendant took it. According to Luster, she discovered a black plastic bag in the back seat of her car on Sunday after defendant returned the car. Luster testified she had a "bad feeling" as soon as she saw the bag. On cross-examination, Luster testified the bag gave her an "eerie" feeling.

¶ 17    The police first interviewed defendant on October 26, 2017. At the beginning of the video-recorded interview, defendant stated Rose went to Indiana to buy a car. Defendant explained he and Rose needed separate cars because he was "fighting" his "cases" and needed to see his attorneys. Defendant also mentioned he disagreed with how his attorneys were handling his cases. Defendant stated he last saw Rose on Sunday, October 22, 2017, at about 6 a.m. Defendant stated he passed out from low blood sugar (defendant has type 1 diabetes) on Sunday morning and then went out that afternoon. Defendant stated when he returned to Rose's house at about 3 p.m., she was not there. Defendant described meeting with Trent and Trai on October 24, 2017, and telling them Rose was missing.

¶ 18    2. *The Police and Forensic Investigations*

¶ 19    Various prosecution witnesses described the police investigation following Trent's missing person report. On October 29, 2017, a crime scene investigator found presumptive blood in Rose's bedroom, living room, kitchen, backyard, and garage. In the bedroom, the investigator found a damp, stained area of carpet. The padding and subfloor beneath the carpet were also stained. The stained portion of the carpet appeared to have been cut and cleaned. The investigator found a starter pistol incapable of firing bullets in a closet. The investigator also found presumptive blood inside Rose's car, as well as pieces of charred material in the trunk.

¶ 20    On November 1, 2017, the investigator processed Luster's 2000 Pontiac Grand Prix, which was in a garage at the Danville Public Safety Building. The investigator noted a foul odor coming from the car mixed with a "detergent-type" smell, like a deodorizer. The investigator located a black plastic bag on the back seat and a sock on the back floorboard. The investigator discovered a foul-smelling comforter, more bedding, and a charred body inside the plastic bag. Inside the sock, the investigator found a human palate containing teeth. The investigator then notified the coroner. The crime laboratory confirmed the remains were Rose's. The crime laboratory also confirmed that defendant's fingerprint was on the plastic bag.

¶ 21    On November 8, 2017, another crime scene investigator processed a "burn area" he described as smelling of gasoline (the crime laboratory confirmed the substance was gasoline) at an abandoned house at 1519 Lyons Street in Danville (the burn site). At the burn site, the investigator found melted plastic, carpet, burned rubber, and bones.

¶ 22    After speaking with defendant's cousin, Nick Patton, the police obtained surveillance videos showing the following. At a little after 5 a.m. on October 22, 2017, the day Rose disappeared, defendant and Patton visited two Circle K gas stations in Danville. Defendant filled a can with gasoline. Defendant then went to Walmart with Patton, where defendant purchased plastic tarps, a comforter, and garbage bags. That evening, defendant returned to Walmart with a companion and together they purchased a gas can, fuel, and a lighter.

¶ 23    On November 2, 2017, Dr. Scott Denton, a forensic pathologist, performed an autopsy on Rose's remains. Dr. Denton testified Rose's body had been burned postmortem and desiccated so that it weighed only 31 pounds at autopsy. Dr. Denton testified there was a gunshot injury to the right side of Rose's face. He recovered a bullet from the skull. Dr. Denton noted Rose's arms were amputated at the forearms, and both legs were "traumatically" amputated above

the knees. Toxicology results showed alcohol in Rose's liver. Dr. Denton opined that Rose died of the gunshot wound to the head. Dr. Denton also opined that bone fragments from the burn site were human and consistent with parts missing from Rose's body.

¶ 24                                    3. *The Informant*

¶ 25         Carroll Hamilton was housed in the cell next to defendant as defendant awaited trial in the county jail. Hamilton testified to prior convictions going back to the 1990s for burglary, theft, and deceptive practices. At the time of trial, Hamilton was facing charges of "criminal trespass and auto burglary." Hamilton testified he was also charged with being accountable "for somebody using a stolen credit card." Hamilton admitted he had previously sought to "trade" information to the authorities, hoping to obtain leniency.

¶ 26         Hamilton testified he was incarcerated in the same cell block of the county jail as defendant in October 2017. According to Hamilton, he knew defendant because he (Hamilton) had been paroled to live with defendant and Rose at Rose's residence for nine days in 2017. Hamilton stated he learned on the news about Rose's disappearance.

¶ 27         According to Hamilton, defendant told him the following concerning Rose's disappearance. Defendant and Rose were "joking around" when Rose "pulled a pistol" on him. Defendant said the pistol was a "starter pistol" that was "fake." Then, defendant "pulled" a .22-caliber revolver on Rose. Defendant heard the starter pistol fire, and then defendant saw blood on the right side of Rose's face. Defendant checked Rose and found she had a heartbeat. Defendant did not call 911. Instead, defendant held Rose for 30 minutes until she "passed." Then, defendant called Patton for help moving Rose's body out of the house to the garage. After they wrapped Rose in a comforter, defendant and Patton went to "several" gas stations, where they filled gas cans, and to Walmart to buy "plastic." During that day, "other people" told defendant and Patton to get more

- 7 -

gas and camper fuel. Then, at night, defendant moved the body to an abandoned house and set it on fire using gasoline and Coleman fuel. Either the next night or the night after that, defendant went back to the burn site. Rain had put out the fire, and animals were eating Rose's corpse, so defendant cut her hands, feet, and jawbone into "smaller pieces and bag[ged] it up." Defendant then "stored" the body parts in the back of his mother's car.

¶ 28　　　　　Hamilton testified he wrote down verbatim what defendant told him as defendant told him the story, hoping to gain leniency from the authorities in exchange for his information. Hamilton sent a copy of his notes to the police. The police then obtained a "medical recognizance" for Hamilton, allowing him to leave jail in the company of a police officer. Hamilton testified he led the police to the burn site, using the description defendant gave him. Hamilton testified he was facing 6 to 30 years in the penitentiary on a pending burglary charge, but because of his cooperation, he was given a sentence of 3 years' imprisonment.

¶ 29　　　　　　　　　4. *Defendant's Statements to the Police*

¶ 30　　　　　As noted, the police first interviewed defendant on October 26, 2017. The police conducted a second video interview with defendant on October 29, 2017. This interview occurred after the police interviewed Patton, obtained surveillance videos from the gas stations and Walmart, and procured search warrants for Rose's house and garage. The State introduced the video of this interview into evidence.

¶ 31　　　　　The video showed the following. The police read *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) to defendant off a printed sheet of paper. Defendant stated he understood each of his rights. As defendant picked up the pen to sign the waiver of rights, he also stated: "When I normally did this I was being charged or accused of something, so." The officers then stated they were six days into their investigation and things they needed to speak about with

- 8 -

defendant had "popped up." As defendant signed the waiver of his rights, he said, "Okay, 'cause I do have an attorney."

¶ 32　　　　The officers informed defendant Rose's phone was at her house all day Sunday, October 22, 2017. The officers stated they had talked to "somebody" who told them defendant shot Rose at her house. Defendant stated he saw Rose early on Sunday morning, October 22, 2017, and gave her $600 to buy a car. Defendant stated he then passed out from low blood sugar and awoke at 6:30 a.m. or 6:40 a.m. Defendant stated he walked wherever he went on that Sunday. Defendant stated he had dinner with his mother, and the only other family members he saw that Sunday were his two grandmothers. Defendant denied having any conversations or meeting with Patton on that Sunday. Defendant stated he did not remember going to a gas station at about 5 a.m. on Sunday, but he stated he might have gone to Walmart early that morning. Defendant added he did not remember doing so. Defendant stated he knew he needed gas so he could mow the lawn.

¶ 33　　　　When told there were videos showing defendant at a gas station and at Walmart with Patton early on Sunday morning, defendant stated low blood sugar caused him not to remember things or to be aware of "what's going on." Defendant stated his low blood sugar was caused by the stress of "fighting three cases" and something that had happened to his "aunty" that caused her to "go a little crazy."

¶ 34　　　　Defendant said he and Rose were up all night on Saturday, October 21, 2017. According to defendant, he and Rose did not argue. Defendant stated he last saw Rose at 6 a.m. on Sunday when she offered to make him breakfast. Defendant denied waking up from his low blood sugar episode to discover something had happened to Rose. Defendant then stated his low blood sugar episode started around 2 a.m. that Sunday. When the officers asked defendant about going to Walmart early Sunday morning to buy garbage bags and a comforter, defendant maintained he

did not remember going there. However, defendant stated he needed a comforter for the bedroom, and he used garbage bags for household garbage.

¶ 35 The officers explained to defendant that if something bad happened to Rose, they needed to know so they could give her family closure. Defendant denied anything happened between him and Rose that Saturday night into Sunday morning. Then, the officers said Patton was worried that defendant did "something" he did not "mean to do." The officers stated they needed defendant to explain what happened because they were "past the point" of saying they did not know what happened. The officers stated it was "clear" defendant caused Rose's disappearance. Defendant then stated: "I said I didn't do anything, period, point blank." Defendant added: "If that's the case, if you feel like based off your investigation, then do what you gotta [*sic*] do, there ain't nothin' further for us to talk about."

¶ 36 The officers told defendant Rose did not offer to make him breakfast at 6 a.m. on Sunday, because "[Rose] wasn't with us at 6 a.m." The officers explained Rose's body was already in her garage by then and they knew what her car was "used for." The officers stated they knew what Patton told them, but this was defendant's opportunity to say what happened. When the officers asked if defendant wanted or needed to "get something off his chest," defendant replied: "No, there's nothin'." The officers then said, "It's stacking up against you." The officers mentioned that in defendant's October 26, 2017, interview, he said he was used to talking to the police in handcuffs and was "surprised when we didn't handcuff you." The officers explained they were just talking to defendant then, "but now it's starting to stack against you." Defendant maintained he had nothing to do with Rose's disappearance and death. At this point, the officers left defendant alone in the interview room for an extended break.

¶ 37        When the interview resumed, defendant acknowledged photographs of himself in Patton's car and at Walmart on Sunday, October 22, 2017—including one of himself grinning as he left Walmart—but defendant denied the photos jogged his memory of the events of that morning. Defendant stated he called his cousin Strader and asked to borrow Strader's truck on the Monday following Rose's disappearance. Then, defendant stated he did not remember exactly when he wanted to borrow Strader's truck. When the officers stated defendant's memory seemed selective, defendant reverted to his earlier statement about his low blood sugar and Rose offering to make him breakfast. Then, the officers informed defendant that story had been "debunked" and "proved to be false." The officers told defendant he did not seem like a "cold-hearted killer." Defendant stated: "I'm not a killer at all." The officers said the case was starting to build up against defendant.

¶ 38        Defendant explained the cut carpet in Rose's bedroom by saying he cut out sections of the carpet in that room in various places, such as the closet. Defendant said he stashed his cousin's drugs and money under the loose squares of carpet. When the police asked about a burned area of carpet at the foot of the bed, defendant said he did that playing with a lighter and a deodorant can. Defendant denied the cut square of carpet at the foot of the bed was presently "soaked with cleaner." Defendant said the wet area was all-purpose purple Listerine he spilled two weeks prior when he had a hard time opening the cap on the bottle. The officers asked if it was "reasonable" to believe the Listerine would still be wet after two weeks. Defendant shrugged and stated he did not know how long it takes for carpeting to dry.

¶ 39        The officers stated they had "talked to everybody," and "things are a problem for you [defendant] right now." The police told defendant that if had he passed out from low blood sugar, he would have been too ill to go to the gas stations and Walmart. The officers said Patton

believed what defendant did was an accident, but defendant's denials looked bad for him. The officers added, "[T]hat sounds like you don't feel any remorse, you don't care." The officers stated they were past defendant's denials, as they needed to get Rose "back" for her family. When the officers asked, "Do you have anything to say to this?" Defendant shook his head and said, "I told you." The police said his denials, which would be played for a jury, made defendant look like a "cold-hearted killer of a mother." Defendant said: "I ain't did nothin' [*sic*] so do what you gotta [*sic*] do." The police asked: "Did something happen in the house?" Defendant replied: "No, it did not."

¶ 40        Defendant stated he did not tell Patton that anything happened and that Patton "fabricated" what he told the police. The officers told defendant they did not need him to tell them what happened so they could prove their case, as "that's already been taken care of." The officers said they needed to know what happened to Rose so they could tell her family what happened. Defendant stated: "If I did anything, I would've told you." The officers stated they wanted to believe him, but the evidence was "piling up" against him. One of the officers said, "If [the evidence] buries you, it buries you, I guess." When the officers said the evidence portrayed defendant as a cold-hearted killer, defendant stated: "Everybody got [*sic*] their opinion about people, whether it's false or whether it's true." The officers said they would tell the jury defendant sat across from them and "didn't care." The officers asked defendant to be "decent." Defendant stated there was nothing he wanted to tell them.

¶ 41        Then, they took another break while defendant stayed alone in the interview room with what appeared to be a sack lunch sitting untouched on the table. Then, someone popped inside the doorway and asked defendant for permission to search his phone. Defendant said, "Yeah, you can search my phone." Next, a police officer offered to bring defendant's medication to him, but

defendant stated his mother would bring it. The remainder of the video consisted of defendant with his head in his arms on a table or lying prone on the floor of the interview room.

¶ 42　　　　After the State rested, defendant called Danville police commander Joshua Webb as a witness. Webb testified a witness told him Rose made a post on Facebook on Monday, October 23, 2017. Webb testified that he did not see the posting, as the witness had deleted it. Defendant then rested, and the State presented no rebuttal.

¶ 43　　　　　　　　　5. *The Verdicts and Sentence*

¶ 44　　　　The jury found defendant guilty of first degree murder and of personally discharging a firearm that proximately caused Rose's death. The jury also found defendant guilty of three counts of concealment of a homicidal death for moving Rose's body (1) from the bedroom, (2) to the burn site, and (3) to a Pontiac Grand Prix. In addition, the jury found defendant guilty of two counts of dismembering a human body: (1) "mutilation by fire" and (2) "dismember, sever, separate." The trial court sentenced defendant to 60 years' imprisonment for first degree murder, 15 years' imprisonment for each conviction of dismembering a human body, and 2 years' imprisonment for each conviction of concealment of a homicidal death, to be served consecutively, for an aggregate sentence of 96 years' imprisonment.

¶ 45　　　　This appeal followed.

¶ 46　　　　　　　　　　II. ANALYSIS

¶ 47　　　　Defendant raises the following issues: (1) his conviction of first degree murder must be reversed or reduced to involuntary manslaughter because the evidence failed to prove he intentionally or knowingly killed Rose; (2) his trial counsel was ineffective for failing to move to suppress, redact, or object to "inadmissible and inflammatory" evidence; (3) the convictions based on the 2019 indictments must be vacated because those charges violated defendant's right to a

speedy trial; and (4) multiple convictions of dismembering a human body and concealment of a homicidal death were improper.

¶ 48                              A. Intentional or Knowing Murder

¶ 49        Defendant contends the only evidence of how Rose was killed consisted of his statements to Hamilton. Hamilton testified defendant said he (defendant) and Rose were "joking around" when Rose "pulled" a starter pistol on defendant. Then, defendant "pulled" a .22-caliber revolver on Rose. Defendant concedes the evidence shows he fired the revolver (the starter pistol was incapable of firing bullets), but he contends what he told Hamilton shows he did so "accidentally or unconsciously." Defendant asks us to reverse outright his first degree murder conviction or, in the alternative, to reduce the conviction to involuntary manslaughter.

¶ 50        The 2017 information charged defendant with (1) intentionally killing Rose, (2) knowing his acts would cause her death, and (3) knowing his acts created a strong probability of death or great bodily harm to Rose. The offense of first degree murder is set forth in section 9-1(a) of the Criminal Code of 2012 (Code) (720 ILCS 5/9-1(a) (West 2016)), which provides:

> "A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:
>
>> (1) he [or she] either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or
>>
>> (2) he [or she] knows that such acts create a strong probability of death or great bodily harm to that individual or another[.]"

¶ 51        Although the statute describes different theories of murder, first degree murder is a single offense. *People v. Smith*, 233 Ill. 2d 1, 16 (2009). "[I]ntentional" and "knowing" murder

delineate "only the mental state or conduct that must accompany" the acts causing death. (Internal quotation marks omitted.) *Smith*, 233 Ill. 2d at 16. To prove first degree murder, it is not necessary to show the accused formed an intent to kill, but only that he or she "voluntarily and willfully committed an act, the natural tendency of which was to destroy another's life, with the intent being implied from the character of the act." *People v. Latimer*, 35 Ill. 2d 178, 182-83 (1966).

¶ 52        Section 9-3(a) of the Code defines involuntary manslaughter:

> "A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly ***." 720 ILCS 5/9-3(a) (West 2016).

A person acts recklessly when he "consciously disregards a substantial and unjustifiable risk that his acts are likely to cause death or great bodily harm to another." *People v. Elizondo*, 2021 IL App (1st) 161699, ¶ 69. Involuntary manslaughter is a lesser-included offense of first degree murder. *Elizondo*, 2021 IL App (1st) 161699, ¶ 70. The mental state required for recklessness can be inferred from the character of the defendant's acts and from the circumstances surrounding the commission of the offense. *Elizondo*, 2021 IL App (1st) 161699, ¶ 69.

¶ 53        When presented with a challenge to the sufficiency of the evidence, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Mimms*, 312 Ill. App. 3d 226, 228 (2000).

¶ 54        Defendant posits the following demonstrate the accidental or unintentional nature of the killing: (1) defendant "might" have been "startled" when Rose's starter pistol "went off," causing defendant to "stumble and discharge" the revolver; (2) Rose was shot only once;

(3) Rose's children were present in the home, making it illogical defendant would have intentionally shot Rose with witnesses nearby; (4) when Bryant saw Rose at 3 a.m. on Sunday, everything appeared "normal," meaning it was unlikely Rose and defendant were arguing; and (5) Rose had alcohol in her system, making it likely she engaged in risky behavior with the starter pistol. Defendant argues the evidence allowed for the possibility defendant's revolver accidentally discharged while he and Rose were "joking around."

¶ 55    Defendant relies on *People v. Cunningham*, 2019 IL App (1st) 160709, ¶ 33, where the court held the evidence insufficient to show the defendant acted recklessly in shooting himself in the leg where there was no evidence of when the shot was fired or that anyone was present in the apartment when the defendant shot himself. The court noted the defendant might have "purposely and voluntarily" pulled the trigger, or he might have been trying to unload the gun, making the discharge accidental. *Cunningham*, 2019 IL App (1st) 160709, ¶ 32. *Cunningham* is inapposite because in our case we have clear evidence of defendant's mental state. Defendant shot Rose in the face. According to defendant's statement to Hamilton, as soon as defendant saw the blood on Rose's face, he detected she had a heartbeat. Yet, defendant did nothing for the next 30 minutes except watch Rose die. Then, defendant concealed the homicide and Rose's body. The attempt to dispose of a victim's body is evidence of consciousness of guilt. See *People v. Bounds*, 171 Ill. 2d 1, 49 (1995).

¶ 56    Defendant argues what occurred after he shot Rose is irrelevant. However, as the State notes, determination of a defendant's mental state can be inferred by circumstantial evidence. *People v. Garcia*, 407 Ill. App. 3d 195, 201-02 (2011). The jury's function is to draw inferences based on the evidence, and the jury is not required to accept any possible explanation compatible with the defendant's innocence and raise that explanation to the level of reasonable doubt. *People*

*v. Moore*, 358 Ill. App. 3d 683, 688 (2005). Here, in light of the evidence that defendant willed Rose's death by doing nothing to save her and then disposed of her remains in the most heinous ways possible, the jury could have reasonably disbelieved defendant's self-serving statement to Hamilton that Rose was shot while they were "joking around." Accordingly, we reject defendant's argument that he was not proved guilty beyond a reasonable doubt of intentional or knowing murder. Because we hold that any rational trier of fact could have found the elements of intentional or knowing murder beyond a reasonable doubt, we also reject defendant's contention we should reduce his conviction to involuntary manslaughter.

¶ 57                              B. Ineffective Assistance of Counsel

¶ 58            Defendant argues his trial counsel was ineffective for failing to (1) move to suppress defendant's statements after he invoked his right to remain silent, (2) move to redact inadmissible portions of the interrogation videos, (3) request limiting instructions regarding the jury's use of the officers' statements during the interrogations of defendant, and (4) object to the prosecution's misstatements of the evidence during closing argument.

¶ 59            A defendant has a constitutional right to the effective assistance of counsel. *People v. Tayborn*, 2016 IL App (3d) 130594, ¶ 16. To establish ineffective assistance of counsel, the defendant must show both (1) his counsel's representation fell below an objective standard of reasonableness and (2) prejudice. *Tayborn*, 2016 IL App (3d) 130594, ¶ 16. The failure to establish either prong is fatal. *People v. Jones*, 371 Ill. App. 3d 303, 307 (2007). Our review is *de novo*. *Tayborn*, 2016 IL App (3d) 130594, ¶ 16.

¶ 60                              1. *Invocation of the Right to Remain Silent*

¶ 61            Defendant argues his counsel was ineffective for not moving to suppress his October 29, 2017, statements to the police after defendant stated: "I said I didn't do anything,

period, point blank. If that's the case, if you feel like based off your investigation, then do what you gotta [*sic*] do, there ain't nothin' further for us to talk about." Defendant contends this statement was sufficiently clear and unequivocal to invoke his right to remain silent.

¶ 62   Statements a defendant makes after he or she properly invokes the right to remain silent are admissible only if the defendant's right to cut off questioning is "scrupulously honor[ed]." *Jones*, 371 Ill. App. 3d at 307. The general rule is "once an individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *People v. Pierce*, 223 Ill. App. 3d 423, 429 (1991). However, the "demand to end the interview must be specific." *Pierce*, 223 Ill. App. 3d at 429. The right to end an interrogation is not invoked where the defendant merely resists answering questions concerning particular details of the offense. *People v. Aldridge*, 79 Ill. 2d 87, 95 (1980).

¶ 63   The decision whether to file a motion to suppress is generally considered to be a matter of trial strategy, which is entitled to great deference. *Jones*, 371 Ill. App. 3d at 307. To demonstrate ineffective assistance of counsel, the defendant must show the outcome of the trial would have been different if the evidence was suppressed. *Jones*, 371 Ill. App. 3d at 307.

¶ 64   Here, on October 29, 2017, defendant signed the waiver of rights and initially claimed he did not see or speak to Patton on the Sunday Rose disappeared. Before the officers revealed their knowledge of what happened, defendant reiterated and embellished his earlier statements about Rose purchasing a car and his passing out that morning from low blood sugar. It was only after the officers confronted defendant with details of their investigation—which showed defendant's story to be false—that defendant stated: "I said I didn't do anything, period, point blank." Defendant added: "If that's the case, if you feel like based off your investigation, then do what you gotta [*sic*] do, there ain't nothin' further for us to talk about." In context, rather than

invoking his right to remain silent, defendant was expressing his belief the officers had made up their minds he was guilty based on their investigation. That explains why defendant added, "[D]o what you gotta [*sic*] do," meaning arrest him.

¶ 65 Defendant relies on *People v. Flores*, 2014 IL App (1st) 121786. In *Flores*, immediately after the detective read the defendant his rights and the defendant stated he understood each of them, the detective stated " 'Robert' " was saying things about the defendant. *Flores*, 2014 IL App (1st) 121786, ¶ 31. When the detective asked the defendant, " 'You want to talk to us about that?' ", the defendant responded, " 'Not really. No.' " *Flores*, 2014 IL App (1st) 121786, ¶ 31. The court held the defendant's response was "clear and unequivocal *** that [the] defendant did not wish to waive his right to remain silent." *Flores*, 2014 IL App (1st) 121786, ¶ 57. The court relied on the fact the defendant's response "was given immediately following the giving of *Miranda* rights." *Flores*, 2014 IL App (1st) 121786, ¶ 55. Here, defendant—who was familiar with the process and knew how to invoke his rights—signed the waiver and agreed to speak with the officers. Only after the officers exposed defendant's lies did defendant say the officers believed he was responsible for Rose's disappearance so there was nothing further to talk about.

¶ 66 We believe this case is more like *Pierce* than *Flores*. In *Pierce*, upon being given his *Miranda* rights, the defendant asked what would happen if he desired not to answer any more questions. *Pierce*, 223 Ill. App. 3d at 430. The police told the defendant he did not have to talk if he decided not to answer any questions. *Pierce*, 223 Ill. App. 3d at 430. The defendant then stated: " 'You got all the stuff there right now. You don't need no more really.' " *Pierce*, 223 Ill. App. 3d at 430. The court held the defendant "failed to use language sufficiently strong to invoke his constitutional right to remain silent." *Pierce*, 223 Ill. App. 3d at 431. Accordingly, the court held the defendant's counsel was not ineffective for failing to file a motion to suppress the defendant's

statements. *Pierce*, 223 Ill. App. 3d at 431. Here, as in *Pierce*, defendant was commenting that the police had what they thought was sufficient evidence so that nothing further was required.

¶ 67    We also find *People v. Aldridge*, 68 Ill. App. 3d 181 (1979), instructive. In *Aldridge*, the defendant stated during questioning, " 'I think you got enough, you got the story now.' " *Aldridge*, 68 Ill. App. 3d at 186-87. The court held these comments did not "show a desire for all questioning to cease but rather indicate[d] [the] defendant's reluctance to convey to the officers all the details of the offense." *Aldridge*, 68 Ill. App. 3d at 187

¶ 68    In any event, defendant cannot demonstrate the outcome of his trial would have been different had the remainder of the interview been suppressed. Veatch's testimony cast doubt on defendant's story that Rose went to Indiana to buy a car because Veatch and Rose had agreed to meet that Sunday and Rose had not said anything about going to Indiana. Harrier thought it unusual when defendant handed her the baby through the door without inviting her inside the house. Harrier disbelieved defendant's story about a vicious dog because Harrier knew the dog was not vicious. When Rose's family mounted searches, defendant did not participate. Defendant was captured on video filling a gas can and buying paraphernalia at Walmart to dispose of Rose's body when he said he was having a low blood sugar episode at home. Defendant spent the night of Rose's disappearance and the week following with his girlfriend, Crippin, who thought it odd defendant asked her for a lighter. Defendant asked his cousin, Strader, to loan him his truck on the Monday after Rose disappeared, leading to the inference defendant needed the truck to move Rose's body from the garage to the burn site. Then, defendant borrowed his mother's car, in which Rose's remains were found wrapped in a comforter and stuffed in a plastic bag. The plastic bag contained defendant's fingerprint. Finally, defendant confessed to killing Rose and burning and dismembering her body when he confessed to Hamilton. Hamilton's testimony was corroborated

by the physical evidence at the burn site and Rose's autopsy. Accordingly, we hold that defense counsel did not render ineffective assistance in failing to file a motion to suppress.

¶ 69          2. *Defendant's Remaining Allegations of Ineffective Assistance of Counsel*

¶ 70          Defendant argues his counsel was ineffective for failing to move to redact portions of the October 26 and 29, 2017, video interviews where (1) the officers stated their belief defendant killed Rose (October 29), (2) Patton's statements to the police about defendant's involvement in Rose's death were hearsay (October 29), and (3) defendant's statements implicated himself in other crimes when he stated he was stressed from "fighting three cases" and usually was in handcuffs when he talked to the police (October 26 and October 29).

¶ 71          Questions and statements made by the police during a defendant's interrogation are probative if (1) they are "helpful" and (2) the probative value of the officers' questions and statements is not substantially outweighed by their prejudicial effect. *People v. Whitfield*, 2018 IL App (4th) 150948, ¶ 48. Officers' questions and statements during an interrogation are helpful where they place the defendant's statements and silence into context. *Whitfield*, 2018 IL App (4th) 150948, ¶ 59. Hearsay is not involved where the challenged statements are offered to prove their effect on a listener's mind or to show why the listener subsequently acted as he did. *Whitfield*, 2018 IL App (4th) 150948, ¶ 47. Officers' statements during an interrogation are not hearsay where they are "useful" in explaining the defendant's statements and admissions. *Whitfield*, 2018 IL App (4th) 150948, ¶ 49. Here, the officers' statements during the October 29, 2017, interrogation were helpful and useful in explaining (1) defendant's complete lack of affect when discussing his paramour's disappearance and demise and (2) defendant's far-fetched explanations for Rose's disappearance, his presence at the gas stations and Walmart, and his cutting up the wet bedroom rug.

¶ 72　　　　Defendant's reliance on *People v. Hardimon*, 2017 IL App (3d) 120772, is misplaced. In *Whitfield*, we disagreed with the *Hardimon* court's imposition of a " 'necessary' " standard for determining whether officers' statements and questions are probative. *Whitfield*, 2018 IL App (4th) 150948, ¶ 48. Moreover, in *Hardimon*, the officers' statements to the defendant were truly inflammatory, rather than helpful. In *Hardimon*, the officers told the defendant the media would use the word " 'execute' " next to the defendant's picture and the defendant's failure to implicate himself would prevent the defendant from seeing his son. *Hardimon*, 2017 IL App (3d) 120772, ¶ 36. Also, in *Hardimon*, the court noted there was no eyewitness identification, the defendant made no admissions, and the physical evidence did not directly implicate the defendant. *Hardimon*, 2017 IL App (3d) 120772, ¶ 39. In our case, the evidence against defendant was overwhelming.

¶ 73　　　　Defendant's reliance on *People v. Davila*, 2022 IL App (1st) 190882, is also misplaced. In *Davila*, the court found the complained-of interrogation of the defendant to be prejudicial where the State's case rested on witness credibility with "minimal circumstantial evidence tying [the] defendant's gang activity" to the shooting. *Davila*, 2022 IL App (1st) 190882, ¶ 69. Here, as noted, the evidence against defendant was overwhelming.

¶ 74　　　　Defendant also asserts his counsel's ineffectiveness for not requesting limiting instructions as to how the jury should consider the officers' statements during the interviews, particularly those related to what Patton told the police. However, defendant concedes no Illinois court has addressed the need for such instructions.

¶ 75　　　　Additionally, defendant argues counsel was ineffective when she failed to object to the prosecution's closing argument implying defendant failed to tell the police about his low blood sugar until after the officers confronted defendant with the evidence against him, when, in fact,

defendant first volunteered his statement about low blood sugar. In context, the prosecutor's argument was based on the evidence. After defendant was confronted with the gas station and Walmart surveillance videos, defendant changed his story to claim the low-blood-sugar episode began at 2 a.m. rather than 6 a.m. After the officers confronted defendant with the evidence, defendant blamed his low blood sugar for why he did not remember being at the gas stations and Walmart. Defendant earlier denied being at those places.

¶ 76　　　　Likewise, we reject defendant's assertion that counsel was ineffective for not moving to redact the references to defendant usually being in handcuffs or under arrest when he spoke with the police and statements defendant was "fighting" his cases. Those references were made in passing, unlike the sustained and concentrated questioning about the defendant's involvement in other crimes that occurred during an interrogation in *People v. Moore*, 2012 IL App (1st) 100857, ¶¶ 49-51. Also, defendant's references to fighting his cases explained why Rose went to Indiana to buy a car. Defendant stated they needed a second car so defendant could see his attorneys. Respecting defendant's statements he stashed his cousin's drugs and money under the bedroom carpeting, those statements were helpful in explaining why defendant cut the square of carpet and in showing the farcicality of his explanation.

¶ 77　　　　Even if defense counsel's performance were deficient, defendant cannot establish prejudice. If an ineffective-assistance-of-counsel claim can be disposed of on the prejudice prong, we need not decide whether counsel's performance was deficient. *People v. Evans*, 186 Ill. 2d 83, 94 (1999). To demonstrate prejudice, the defendant must show there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different. *People v. Pulliam*, 206 Ill. 2d 218, 249 (2002). The defendant must show that counsel's deficient performance rendered the trial "unreliable or the proceeding fundamentally unfair." *People v.*

*Simms*, 192 Ill. 2d 348, 362 (2000). Here, there is no reasonable probability that, but for counsel's claimed errors, the guilty verdicts would have been different.

¶ 78　　　　Without the video interviews, the circumstantial evidence against defendant was compelling. Defendant's explanation to Trent and Trai that Rose went to Indiana to buy a car and never returned was refuted by Veatch, who testified she and Rose made plans to be together that Sunday and Rose said nothing about buying a car. Bryant saw Rose at 3 a.m. on Sunday but at 11 a.m., defendant, not Rose, told Bryant to pick up her baby. At 11:30 a.m., defendant handed the baby through the door to Harrier, who noted he did not welcome her inside the house. Defendant did not participate in searches to find Rose. Defendant spent Sunday night and all but one night the week following with Crippin. On the one night defendant did not spend with Crippin, he asked her for a lighter, which she found odd because defendant did not smoke. Defendant wanted to borrow Strader's truck on the Monday after Rose disappeared. Defendant borrowed his mother's car, in which Rose's remains were found. Defendant's fingerprint was on the plastic bag containing Rose's remains wrapped in a comforter. Video surveillance established that defendant was at a gas station at about 5 a.m. on Sunday, October 22, 2017, the day Rose disappeared, filling a gas can. Video surveillance placed defendant at Walmart on Sunday showing him purchasing plastic tarps, a comforter, fuel, garbage bags, and a lighter. Rose's body was burned. Charred material was found in the trunk of Rose's car. Presumptive blood was found in the bedroom Rose shared with defendant. The burned bedroom carpet had a square cut out of it and was damp with a cleaning agent. The State's direct evidence consisted of defendant's admissions to Hamilton, which were corroborated by the physical evidence. Taken together, the direct and circumstantial evidence of defendant's guilt were overwhelming. Accordingly, we reject defendant's claims that his counsel

was ineffective for failing to move to suppress the October 26 and 29, 2017, videos in whole or in part.

¶ 79                    C. The Convictions Relating to the 2019 Indictments

¶ 80        Defendant contends the 2019 charges of concealment of a homicidal death and dismembering a human body were subject to compulsory joinder with the concealment of a homicidal death charge in the 2017 information. Defendant argues the State's failure to charge him with the 2019 allegations until after his speedy-trial term ran on the 2017 charge (defendant remained in custody after his October 29, 2017, arrest and the State does not dispute that the term expired) requires that we vacate his convictions of the 2019 charges. Defendant also claims his counsel was ineffective for failing to move to dismiss the 2019 charges on speedy-trial grounds. The State maintains the 2019 charges were not subject to compulsory joinder.

¶ 81        As an aid to understanding these issues, we briefly recap the facts with particular attention to the dates of events. Defendant was arrested on October 29, 2017. On October 31, 2017, the State charged defendant by information with six counts of first degree murder and one count of concealment of a homicidal death. The concealment charge alleged defendant committed the offense "on or about October 22, 2017," by "transporting [Rose's] body from the place of her death and hid or otherwise disposed of her remains." According to defendant, his speedy-trial term on the 2017 charges expired on November 10, 2018.

¶ 82        On December 20, 2019, the State brought additional charges in two separate indictments. In case No. 19-CF-732, the State charged defendant with (1) dismembering a human body in that defendant, "on or about" the twenty-third to the twenty-sixth day of October 2017, "knowingly mutilated the deceased body of [Rose] by use of fire" and (2) concealing a homicidal death in that defendant, "on or about" the twenty-third to the twenty-sixth day of October 2017,

"knowingly concealed the death of [Rose] by moving her body to the property near 1519 Lyons St. Danville, IL, with knowledge that [Rose] had died by homicidal means." In case No. 19-CF-733, the State charged defendant with (1) dismembering a human body in that, "on or about the 27th to the 29th day of October, 2017" defendant knowingly "dismembered, severed, and separated body parts from the deceased body of [Rose]" and (2) concealing a homicidal death in that, "on or about the 27th to the 29th day of October, 2017," defendant knowingly concealed Rose's death by "placing [Rose's] body parts in a sock and bag and placed them into a 2000 Pontiac Grand Prix, with knowledge that [Rose] had died by homicidal means."

¶ 83        At trial, the evidence established the following. Defendant killed Rose between 3 a.m. and 5 a.m. on Sunday, October 22, 2017. At 3 a.m., Bryant saw Rose when she dropped her baby at Rose's house. Video evidence placed defendant at a gas station filling a gas can at 5 a.m. and then at Walmart purchasing items used to burn and conceal Rose's body. On Monday, October 23, 2017, defendant asked Strader to loan him a truck.

¶ 84        On November 1, 2017, the forensic investigator processed Luster's Grand Prix and found Rose's remains in the plastic bag and the sock. On November 2, 2017, Dr. Denton performed the autopsy on Rose's remains and found (1) the cause of death was a gunshot wound to the face, (2) Rose's arms and legs were traumatically amputated postmortem, and (3) Rose's remains had been burned.

¶ 85        On November 7, 2017, the police obtained Hamilton's account. Hamilton's testimony established (1) defendant and Patton moved Rose's body from the house to her garage on October 22, 2017, (2) defendant moved the body from the garage to an abandoned house and set it on fire, and (3) either the next night, or the night after that, defendant went back to the burn site where he dissected Rose's body into smaller pieces. Defendant then bagged the remains and

stored the body parts in the back of his mother's car. On November 8, 2017, the police discovered the burn site.

¶ 86 Luster's testimony established defendant borrowed her Pontiac Grand Prix the weekend of October 27, 2017. According to Luster, when defendant returned the car to her on Sunday, October 29, 2017, the "eerie" plastic bag was in the backseat. The police and forensic investigations were completed around November 8, 2017.

¶ 87                                     1. *The Compulsory Joinder Statute*

¶ 88 Section 3-3(b) of the Code (720 ILCS 5/3-3(b) (West 2016)) provides:

"If *** several offenses are known to the proper prosecuting officer *at the time of commencing the prosecution* and are within the jurisdiction of a single court, they must be prosecuted in a single prosecution *** *if they are based on the same act*." (Emphases added.)

"Compulsory joinder requires the State to bring multiple charges in a single prosecution." (Internal quotation marks omitted.) *People v. Williams*, 204 Ill. 2d 191, 200 (2003). This rule is subject to three conditions: (1) the several charges are known to the prosecution when the prosecution begins, (2) the charges are within the jurisdiction of a single court, and (3) the charges are based on the same act. *People v. McGee*, 2015 IL App (1st) 130367, ¶ 28.

¶ 89 The compulsory joinder statute was enacted to " 'prevent the prosecution of multiple offenses in a piecemeal fashion and to forestall, in effect, abuse of the prosecutorial process.' " *People v. Hunter*, 2013 IL 114100, ¶ 18. In *Hunter*, our supreme court cautioned that whether later charges are based on the same act as the earlier charge is not to be given a "hypertechnical" interpretation. *Hunter*, 2013 IL 114100, ¶ 18. However, the court also held that joinder is required where the defendant engaged in " 'only one continuous and uninterrupted act.' "

*Hunter*, 2013 IL 114100, ¶ 18. In *People v. Mueller*, 109 Ill. 2d 378, 385 (1985), our supreme court held the fact that the acts of shooting the victim and concealing the homicidal death were related was "irrelevant" for purposes of compulsory joinder. "There is no requirement of joinder where multiple offenses arise from a series of related acts." *Mueller*, 109 Ill. 2d at 385.

¶ 90                    2. *The Speedy Trial Statute*

¶ 91        "Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he or she was taken into custody unless delay is occasioned by the defendant ***." 725 ILCS 5/103-5(a) (West 2016). The 120-day term begins to run automatically if the defendant remains in custody pending trial. *People v. McBride*, 2022 IL App (4th) 220301, ¶ 38. If the defendant is not tried within that period, he or she shall be discharged from custody. *McBride*, 2022 IL App (4th) 220301, ¶ 38.

¶ 92        3. *The Interplay Between the Compulsory Joinder and Speedy Trial Statutes*

¶ 93        In *People v. Gooden*, 189 Ill. 2d 209, 218 (2000), our supreme court recognized the "important interaction" between the speedy-trial provisions and the compulsory joinder provision when "additional charges are brought against a defendant who had been previously charged." In *Gooden*, the court held that once a defendant has been *prosecuted* for an offense, the State is "barred from prosecuting him or her for any other offense" which, pursuant to the compulsory joinder provision, should have been joined with the original prosecution. *Gooden*, 189 Ill. 2d at 219. Once a defendant files a speedy-trial demand, even if the State brings some of the charges later, the speedy-trial period begins to run on all of the charges when the demand is filed. *Williams*, 204 Ill. 2d at 200. However, it is "irrelevant" for purposes of compulsory joinder that multiple offenses arise from "distinct, but related, acts in the course of a single incident." *Gooden*, 189 Ill.

2d at 219. In other words, the defendant cannot "enlarge the reach of the compulsory-joinder statute by way of the speedy-trial statute." *Gooden*, 189 Ill. 2d at 220.

¶ 94                                    4. *Compulsory Joinder in This Case*

¶ 95        The State argues the 2019 charges were not subject to compulsory joinder with the 2017 concealment charge because they (1) were not known to the prosecution when the prosecution began in 2017 and (2) were not based on the same act as the 2017 charge. As noted, defendant was charged by information with first degree murder and concealment of a homicidal death on October 31, 2017. The State maintains that is the date the prosecution began. Defendant asserts the prosecution began on November 16, 2017, when he waived his right to a preliminary hearing. Defendant also asserts the prosecution knew of the 2019 charges as of November 16, 2017, and that the 2019 indictments charged the same acts as the 2017 information, albeit in more detail. Our review is *de novo*. See *Hunter*, 2013 IL 114100, ¶ 12.

¶ 96                              a. When the Prosecution Began

¶ 97        The first condition for compulsory joinder is that the later charges were known to the prosecution when the prosecution began. *McGee*, 2015 IL App (1st) 130367, ¶ 28. "[K]nowledge" means the "conscious awareness of evidence that is sufficient to give the State a reasonable chance to secure a conviction." (Internal quotation marks omitted.) *McBride*, 2022 IL App (4th) 220301, ¶ 41. If, as defendant posits, the prosecution began on November 16, 2017, the prosecution had the benefit of the full police and forensic investigations and therefore knew about the facts that formed the 2019 charges. However, if the prosecution began on October 31, 2017, as the State suggests, the prosecution did not know of (1) the autopsy results and Dr. Denton's opinions, (2) the presence of the burn site and its contents, (3) the grisly contents of the plastic bag

and sock found in Luster's Grand Prix, and (4) Hamilton's information detailing how and when defendant moved, burned, and severed Rose's body.

¶ 98       In arguing the prosecution began when he waived the preliminary hearing on November 16, 2017, defendant relies in part on section 111-2(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/111-2(a) (West 2016)), which provides that "[n]o prosecution may be *pursued* by information unless a preliminary hearing has been held or waived \*\*\* and at that hearing probable cause to believe the defendant committed an offense was found." (Emphasis added.) Defendant cites *People v. Clarke*, 231 Ill. App. 3d 504 (1992), in support of his argument. In *Clarke*, the court said the "purpose of the right to a prompt preliminary hearing is to ensure that a defendant will not be held in custody or to bail, that is, that his freedom will not be restricted, without a prompt showing of evidence that a crime has been committed." *Clarke*, 231 Ill. App. 3d at 508. *Clarke* did not hold that a preliminary hearing begins the prosecution. Defendant's reliance on *People v. Macon*, 396 Ill. App. 3d 451 (2009), is also unavailing, as it supports the State's position. In *Macon*, the court held a felony prosecution commences on the date the indictment is returned or the information is filed. *Macon*, 396 Ill. App. 3d at 456. This accords with section 2-16 of the Code (720 ILCS 5/2-16 (West 2016)), which provides that " '[p]rosecution' means all legal proceedings by which a person's liability for an offense is determined, *commencing with the return of the indictment or the issuance of the information*, and including the final disposition of the case upon appeal." (Emphasis added.) It is "established" Illinois law that the " 'date the indictment is found or the information is filed marks the commencement of the felony prosecution.' " *People v. Leavitt*, 2014 IL App (1st) 121323, ¶ 40.

¶ 99       Despite the clear mandate of statutory and case authority that a prosecution begins with the charging instrument, defendant urges that section 2-16 of the Code is only a *general*

statute that must yield to the more specific statute (section 111-2(a) of the Code of Criminal Procedure of 1963) providing that no prosecution can be *pursued* unless probable cause is found at a preliminary hearing. This is not a chicken-or-the-egg proposition. Unless a defendant is charged with an offense, the need for a preliminary hearing does not even arise. See *People v. Howell*, 60 Ill. 2d 117, 119 (1975) (stating a defendant *held on a criminal charge* punishable by imprisonment in the penitentiary is entitled to a prompt probable-cause determination *of the validity of the charge* either at a preliminary hearing or by indictment by a grand jury).

¶ 100    We also reject as patently erroneous defendant's argument that a prosecution is commenced with an indictment but when initiated by information, the prosecution commences only with a preliminary hearing. Our legislature provided unequivocally that a prosecution commences with the "return of the indictment *or the issuance of the information*." (Emphasis added.) 720 ILCS 5/2-16 (West 2016). Accordingly, we hold the prosecution in the present case began with the filing of the information on October 31, 2017.

¶ 101    b. Whether the 2017 and 2019 Concealment Charges Alleged the Same Acts

¶ 102    The 2017 information charged:

> "[Defendant] on or about the 22 day of October, 2017, with knowledge that [Rose] had died by homicidal means, knowingly concealed the death of [Rose] by transporting her body from the place of her death and hid or otherwise disposed of her remains, in violation of 720 ILCS 5/9-3.4 (a)."

¶ 103    In 2019, the prosecution added two more concealment charges: (1) "on or about" the twenty-third to the twenty-sixth day of October 2017, defendant "knowingly concealed the death of [Rose] by moving her body to the property near 1519 Lyons St. Danville, IL, with knowledge that [Rose] had died by homicidal means" and (2) "on or about the 27th to the 29th day

- 31 -

of October 2017" defendant knowingly concealed Rose's death by "placing [Rose's] body parts in a sock and bag and placed them into a 2000 Pontiac Grand Prix, with knowledge that [Rose] had died by homicidal means."

¶ 104        To establish the offense of concealment of a homicidal death, the evidence must show (1) a homicide has occurred, (2) the defendant knew both the fact and cause of death, and (3) the defendant took affirmative steps to conceal the homicide with the specific purpose of preventing or delaying its discovery. *People v. Kirkman*, 170 Ill. App. 3d 106, 110 (1988). "Concealment of a homicidal death includes situations where the homicidal nature of the death *or the body itself* is concealed." (Emphasis added.) *Kirkman*, 170 Ill. App. 3d at 110.

¶ 105        Defendant relies on *People v. Smith*, 2017 IL App (1st) 161231. In *Smith*, the police discovered marijuana, counterfeit currency, and equipment for making the currency in the defendant's home during a search. *Smith*, 2017 IL App (1st) 161231, ¶ 1. The State charged the defendant with possession of marijuana but not with counterfeiting. *Smith*, 2017 IL App (1st) 161231, ¶ 4. After the defendant pleaded guilty to the marijuana charge, the Illinois Attorney General charged the defendant with counterfeiting based on the items found during the search that led to the marijuana charge. *Smith*, 2017 IL App (1st) 161231, ¶ 4. The appellate court upheld the trial court's dismissal of the counterfeiting charges because the defendant committed a " 'single physical act' " in simultaneously possessing the marijuana and the counterfeiting paraphernalia. *Smith*, 2017 IL App (1st) 161231, ¶¶ 13, 17. *Smith* is inapposite because after defendant shot Rose, he moved her body to different locations at different times. Thus, in our case, there was more than one "physical act."

¶ 106        Our decision in *People v. Mueller*, 130 Ill. App. 3d 385 (1985), is instructive. In *Mueller*, the defendant killed two men and put their bodies in a hog pen in Scott County. *Mueller*,

130 Ill. App. 3d at 386. That night, the defendant loaded the bodies in his truck and drove them to Cass County, where he dumped them off a bridge. *Mueller*, 130 Ill. App. 3d at 386. Both bodies were eventually recovered. *Mueller*, 130 Ill. App. 3d at 386. After the defendant was acquitted of the Scott County murders, he was charged in Cass County with concealment of the homicidal deaths. *Mueller*, 130 Ill. App. 3d at 386. The defendant moved to dismiss the concealment charges on the ground the Scott County State's Attorney had agreed not to charge him with that offense. *Mueller*, 130 Ill. App. 3d at 386-87. Defendant argued that as to each body, there was only one offense that originated in Scott County and continued into Cass County. *Mueller*, 130 Ill. App. 3d at 387. We held the defendant's acts of dumping the bodies in Cass County constituted a distinct offense from placing the bodies in the hog pen in Scott County. *Mueller*, 130 Ill. App. 3d at 389. Our supreme court affirmed, holding that the compulsory joinder statute is not intended to cover the situation where several offenses arise from a "series of acts which are closely related with respect to the offender's single purpose or plan." (Internal quotation marks omitted.) *Mueller*, 109 Ill. 2d at 385. Consequently, we hold the 2019 indictments in our case charged different acts from those alleged in the 2017 information.

¶ 107 Nevertheless, defendant contends the 2017 charge was so broadly worded it encompassed all of the acts defendant engaged in to conceal Rose's death, including those charged in 2019. The short answer is the 2017 charge could not have encompassed the 2019 charges because the acts charged in 2019 were not known to the prosecution when the information was filed on October 31, 2017. Also, the 2019 charges alleged discrete acts on different dates.

¶ 108 Defendant argues the prosecution for concealment of a homicidal death was brought in a "piecemeal" fashion that constituted an abuse of the prosecutorial process, as the State waited more than two years to bring charges it could have added in 2017. Defendant asserts he

was led to believe for those two years that the 2017 concealment charge was the only one he needed to defend. One of the purposes of the compulsory joinder statute is to prevent a prosecutor from harassing a defendant through successive prosecutions of multiple offenses. *McGee*, 2015 IL App (1st) 130367, ¶ 41. Because we determine the compulsory joinder statute was not violated, defendant's argument is misplaced. See *Mueller*, 130 Ill. App. 3d at 389 (the compulsory joinder statute did not bar Cass County's prosecution; however, we noted we did not condone the State's lying-in-the-weeds tactics.)

¶ 109             c. The 2017 Information and the 2019 Dismembering Charges

¶ 110             Defendant makes the same compulsory joinder arguments concerning the dismembering charges as he made regarding concealment of a homicidal death. Although the 2017 concealment charge alleged defendant "otherwise disposed of [Rose's] remains," that was attendant to concealing her murder. Prosecution for concealing a homicidal death is restricted to situations where the body itself is concealed or the homicidal nature of the death is concealed, as in making the death appear accidental. *People v. Vath*, 38 Ill. App. 3d 389, 395 (1976). Disposing of Rose's remains by hiding them would conceal the body. This is different from the crime of dismembering a human body, which requires severing, dissection, or mutilation of a deceased body. 720 ILCS 5/12-20.5(a) (West 2016). To be sure, defendant severed and burned Rose's remains to conceal the homicide and her body, but the legislature has determined those are separate offenses from concealment. Accordingly, we reject defendant's arguments that the 2019 dismembering charges were subject to compulsory joinder with the 2017 concealment charge.

¶ 111             d. Ineffective Assistance of Counsel

- 34 -

¶ 112    Because we hold the 2019 indictments were not subject to compulsory joinder with the 2017 information, we also hold defendant's counsel was not ineffective for failing to move to dismiss the 2019 charges on speedy-trial grounds.

¶ 113    D. Multiple Convictions for Concealing a Homicidal Death and Dismembering a Human Body

¶ 114    Defendant was convicted of two counts of dismembering a human body and three counts of concealment of a homicidal death. Defendant argues we must vacate one of the dismembering convictions and two of the concealment convictions because the relevant statutes do not authorize multiple convictions for the different acts in which defendant engaged to conceal and disjoin Rose's body.

¶ 115    The one-act, one-crime rule prohibits multiple convictions if they are based on the *exact same physical act*. *People v. King*, 66 Ill. 2d 551, 566 (1977). In *People v. Hartfield*, 2022 IL 126729, ¶ 67, our supreme court held that a "threshold" to reaching a "one-act, one-crime" issue is to determine the "unit of prosecution" of the offense at issue. In other words, whether a defendant's multiple convictions for violation of a statute can stand under the one-act, one-crime rule depends upon the legislature's prescription of the "allowable unit of prosecution." (Internal quotation marks omitted.) *People v. Sedelsky*, 2013 IL App (2d) 111042, ¶¶ 18-19. For instance, in *People v. Almond*, 2015 IL 113817, ¶ 45, our supreme court proceeded to a one-act, one-crime analysis only after determining the statute at issue authorized separate convictions for the *simultaneous* possession of a firearm and ammunition *in a single loaded firearm*. "[U]nit of prosecution" refers to "what act or course of conduct the legislature has prohibited for purposes of a single conviction and sentence." *Hartfield*, 2022 IL 126729, ¶ 67.

¶ 116    To illustrate: the issue in *Hartfield* was whether a "single discharge in the direction of multiple peace officers can support multiple convictions of aggravated discharge of a firearm." *Hartfield*, 2022 IL 126729, ¶ 66. In *Hartfield*, the defendant fired a gun once at four police officers and was convicted of four counts of aggravated discharge of a firearm. *Hartfield*, 2022 IL 126729, ¶ 1. In a unit-of-prosecution analysis, the number of victims does not control. *Hartfield*, 2022 IL 126729, ¶ 83. Rather, the court looks to the statutory language to determine what the legislature has prohibited and in "what unit of time, actions, or instances that crime is committed once." *Hartfield*, 2022 IL 126729, ¶ 83. "[I]t is the unambiguous intent of the legislature that controls." *Hartfield*, 2022 IL 126729, ¶ 83. If the legislature does not indicate the unit of prosecution, "doubt will be resolved against construing the statute as supporting *multiple instances of the same offense based on the exact same act*." (Emphasis added.) *Hartfield*, 2022 IL 126729, ¶ 83.

¶ 117    Determining the unit of prosecution involves statutory interpretation. *Hartfield*, 2022 IL 126729, ¶ 68. The principal aim of statutory interpretation is to ascertain and give effect to the intent of the legislature. *People v. Slover*, 323 Ill. App. 3d 620, 623 (2001). To determine legislative intent, we first look to the statute's language. *Slover*, 323 Ill. App. 3d at 623. We must give statutory language its plain and ordinary meaning. *Slover*, 323 Ill. App. 3d at 623. Statutory interpretation is a question of law we review *de novo*. *Slover*, 323 Ill. App. 3d at 623.

¶ 118    In *Hartfield* and *Almond*, a unit-of-prosecution analysis was appropriate as a *threshold* to a one-act, one-crime analysis because multiple convictions were based on the same physical act (shooting once at four police officers and possessing one loaded firearm). Here, defendant concedes he committed multiple different physical acts resulting in the dismemberment and concealment of Rose's body. Nonetheless, defendant insists a unit-of-prosecution analysis is

pertinent because there was only one deceased body that was dismembered and one homicidal death that was concealed.

¶ 119                                                  1. *Dismembering a Human Body*

¶ 120          A person commits the offense of dismembering a human body when he or she knowingly "dismembers, severs, separates, dissects, or mutilates any body part of a deceased body." 720 ILCS 5/12-20.5(a) (West 2016). Defendant contends this statute sets forth the types of conduct constituting the offense without specifying the allowable unit of prosecution. Therefore, defendant argues, the legislature did not authorize multiple convictions for different acts constituting dismembering the same body. Defendant's argument proceeds as if the State prosecuted defendant for each act of dismembering. Defendant asserts this interpretation of the statute would allow dozens of prosecutions depending on a prosecutor's zeal. Yet, this is not what occurred. The State charged defendant with offenses committed on different days and by different acts. Mutilation by fire was committed and charged separately from severing and separating the body's appendages. Although defendant committed the separate acts of severing the arms and legs and disarticulating the jaw, the State charged only one count of dismembering because those acts occurred at the same time in the same location.

¶ 121          Defendant also erroneously compares the dismembering statute to murder, where there can be only one conviction for murdering one person. See *People v. Cardona*, 158 Ill. 2d 403, 411 (1994) (stating "[w]here but one person has been murdered, there can be but one conviction of murder"). Obviously, once a person has been killed, he or she cannot be killed again. Here, though, Rose's body could be and was subjected to different acts of dismembering.

¶ 122          Defendant argues interpreting the dismembering statute to allow multiple convictions leads to absurd results because the offense of dismembering a human body is a Class

X felony (720 ILCS 5/12-20.5(d) (West 2016)), which is required to be served consecutively to any other sentence. 730 ILCS 5/5-8-4(d)(5) (West 2016). Defendant posits this could lead to an "endless number" of consecutive Class X sentences adding up to sentences exceeding those for first degree murder. In support of his argument, defendant cites *Rutledge v. United States*, 517 U.S. 292, 297 (1996). However, *Rutledge* involved the issue of whether the defendant could be sentenced under two different statutes for the *same offense*. *Rutledge*, 517 U.S. at 297. Here, defendant was sentenced for different offenses committed on different dates. The trial court sentenced defendant to 15 years' imprisonment on each dismembering conviction, which did not come close to exceeding the 60-year sentence of incarceration the court imposed for first degree murder.

¶ 123                    2. *Concealment of a Homicidal Death*

¶ 124          For purposes of concealment of a homicidal death, "conceal" means the "performing of some act or acts for the purpose of preventing or delaying the discovery of a death by homicidal means." 720 ILCS 5/9-3.4(b-5) (West 2016). Defendant maintains the word "acts" means that a "single offense" of concealment can include more than one act. If, for instance, defendant had, in one uninterrupted, continuous course of conduct moved Rose's body from the bedroom to the garage and then to the burn site and then to the plastic bag and then to his mother's car, these "acts" would constitute one offense of concealment. However, the evidence showed the separate acts of concealment occurred on different dates. Nothing in the statutory language prohibits multiple convictions for multiple different violations of the statute. Concealment of a homicidal death includes situations where the body itself is concealed. *Kirkman*, 170 Ill. App. 3d at 110. That there is but one body does not mean it cannot be concealed more than once. A body

can be hidden in one place and then on another occasion moved to a different hiding place, which is what happened here.

¶ 125 Defendant criticizes the State for citing *Friend v. People*, 2018 CO 90, ¶ 21, but the court in *Friend* aptly noted that even where a statute prescribes a single unit of prosecution, it does not immunize the defendant from being punished separately for successive commissions of the same offense. The court in *Friend* looked at all of the trial evidence to determine whether it supported distinct and separate offenses of child abuse. *Friend*, 2018 CO 90, ¶ 22. To that end, the court considered (1) whether the acts occurred at different locations, (2) whether the acts were the product of "new volitional departures" or were separated by intervening events, (3) whether each legally distinct offense was charged with sufficient specificity to distinguish it from other offenses, and (4) whether the evidence at trial supported convictions on each count. *Friend*, 2018 CO 90, ¶ 22.

¶ 126 We find the analysis in *Friend* persuasive. Assuming, without deciding, that the concealment statute prescribes a single unit of prosecution, the factors enumerated in *Friend* are present in our case. Defendant's acts occurred at different locations. Defendant moved Rose's body from the bedroom to the garage and then from the garage to the burn site and then to the Grand Prix. These acts were separated by intervening events. After defendant shot Rose, he waited 30 minutes for her to die. Then, according to Hamilton, defendant enlisted Patton's aid in moving Rose's body to the garage. Then, defendant went to two gas stations and to Walmart twice that Sunday buying supplies to get rid of the body. The next day, defendant asked to borrow Strader's truck. Strader refused, but defendant somehow transported Rose's body to the burn site. Then, a day or two later, defendant returned to the burn site where he disjoined the body. On the weekend following Rose's murder, defendant borrowed his mother's car in which he placed the plastic bag

and sock containing Rose's body parts. Each legally distinct offense was sufficiently charged by alleging separate dates and discrete acts. Finally, the evidence at trial amply supported the convictions on each count.

¶ 127　　　Nor are we persuaded by defendant's argument that the requirement of consecutive sentences (730 ILCS 5/5-8-4(d)(5) (West 2016)) prohibits construing the statute to allow multiple convictions for different offenses. Here, defendant was sentenced to an aggregate of 6 years' imprisonment on the concealment convictions. These convictions and sentences were not "endless," leading to "absurd results," as defendant argues. We likewise reject defendant's assertion the State's motion to join the separate cases for trial demonstrated each act constituted the same offense. To the contrary, the State's motion to join the cases for trial alleged defendant took "multiple, separate steps" to escape accountability for Rose's murder but the evidence would be admissible in each case. For reasons of judicial economy, and in fairness to defendant, all three cases were tried at once. For these reasons, we conclude a unit-of-prosecution analysis is not applicable, but if it were to be applied, the concealment statute does not prohibit the separate prosecutions and convictions in this case.

¶ 128　　　　　　　　　　III. CONCLUSION

¶ 129　　　For the reasons stated, we affirm the trial court's judgment.

¶ 130　　　Affirmed.

*People v. Keys*, 2023 IL App (4th) 210630

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Vermilion County, Nos. 17-CF-725, 19-CF-732, 19-CF-733; the Hon. Nancy S. Fahey, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Caroline E. Bourland, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Katherine M. Doersch and Eric M. Levin, Assistant Attorneys General, of counsel), for the People. |