NOTICE
Decision filed 04/07/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 230639-U

NO. 5-23-0639

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 22-CF-788 |
| | ) | |
| QUIONTE D. CHANEY, | ) | Honorable |
| | ) | Roger B. Webber, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Presiding Justice Cates and Justice Vaughan concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirm defendant's conviction for first degree murder where defendant failed to establish that he received ineffective assistance of counsel at trial and sentencing.

¶ 2   Following a jury trial in the circuit court of Champaign County, defendant, Quionte D. Chaney, was found guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2022)) and to have personally discharged a firearm that proximately caused death to another person (730 ILCS 5/5-8-1(d)(iii) (West 2022)). The trial court sentenced defendant to 58 years in prison, followed by 3 years of mandatory supervised release (MSR). Defendant appeals, arguing that he received ineffective assistance of counsel at trial, where defense counsel failed to object to inadmissible hearsay statements of a non-testifying witness elicited through Facebook messages and to irrelevant and prejudicial witness testimony. Defendant also argues that defense counsel was

1

ineffective for failing to raise an as-applied challenge to his mandatory *de facto* life sentence under the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On August 17, 2022, a grand jury returned a bill of indictment charging defendant with four counts of first degree murder (720 ILCS 5/9-1(a)(1) (West 2020); *id.* § 9-1(a)(2)). The charges stemmed from the April 12, 2022, shooting death of Rayvell E. Lofton. Defendant had previously been arrested on July 25, 2022, and was in custody.

¶ 5     On June 5, 2023, the State filed a motion *in limine* seeking to present Facebook records as self-authenticating business records at trial. The State alleged that, pursuant to Illinois Rule of Evidence 902(11) (eff. Jan. 1, 2011), the Facebook records would be self-authenticating if accompanied by a proper certification by a custodian of records. The State attached as exhibits to the motion certifications by a custodian.

¶ 6     On June 12, 2023, a three-day jury trial commenced. As a preliminary matter, the trial court addressed the State's motion *in limine* regarding the Facebook records. The State explained that it had obtained "two sets of data from Facebook" that had been placed onto a DVD. The State clarified specifically what was on the DVD, stating that "[o]ne [was] for an account named Que OnGo, one [was] for an account named Bobby Brown." The State added that the trial evidence would show that both accounts were "attributed to the defendant." Defense counsel objected to the foundation of the records. The court ruled that the records would be admissible "subject to the completion of the foundation" at trial.

¶ 7     Erik Fricke, an Illinois State Police trooper, testified for the State. Fricke photographed the crime scene, including Lofton's body, on April 12, 2022. The crime scene was a two-story

apartment located in Rantoul, Illinois. The photographs taken by Fricke were admitted into evidence and shown to the jury without objection from the defense.

¶ 8    Several photographs depicted the outside of the apartment complex. The photographs showed a partially opened storm door and fully opened front door outside of the apartment where Lofton's body was found. Various personal items, including laundry baskets and a television, were scattered around the steps leading to the front door. The photographs also depicted numerous personal items strewn about the inside of the apartment, including the entryway of the apartment. One photograph depicted Lofton lying deceased on a pile of clothing near the front entryway. Another photograph depicted overturned furniture in one bedroom.

¶ 9    Lauren Henley testified next for the State. Lauren was Lofton's girlfriend and the sister of defendant's girlfriend, Skyler Henley. Skyler and defendant lived together in an apartment owned by Skyler and Lauren's mother. Skyler and defendant also lived with defendant's cousin, Kristopher Mockbee.

¶ 10    Lauren testified that she communicated with Skyler, defendant, and Mockbee via Facebook, which allowed her to exchange phone calls and messages with each of these individuals. Skyler's Facebook account name was "Skai Michelle." Defendant had two Facebook accounts, "Que OnGo" and "Bobby Brown." Defendant created the Bobby Brown Facebook account after Lofton's death. Lofton's Facebook account was "Vello Macc."

¶ 11    Lauren described a prior incident between defendant and Lofton that occurred at her house on December 27, 2021. She observed Skyler and defendant get into a physical altercation. Lofton "stepped in and said something." Defendant responded by lifting "his shirt up and show[ing] [Lofton] a gun and act[ing] like he was gonna pull it out, so [Lofton] choked [defendant] up, put

3

[defendant] on the wall, and [Lofton] made [defendant] get out." Lauren agreed that defendant and Lofton did not have a friendly relationship.

¶ 12    Lauren indicated that her mother had directed defendant and Mockbee to move out of the apartment they shared with Skyler. Lofton agreed to assist in moving defendant and Mockbee out of the apartment because Lauren and Skyler's family did not want to involve police.

¶ 13    Lauren next testified regarding the events that occurred on April 12, 2022. On that date, Lofton dropped Lauren off at work. Lofton and Anthony Flynn, Lofton's friend, went to Skyler's apartment to unlock the door for Mockbee. Lauren expected that Lofton would pick her up when her shift ended at 7 p.m., but he never arrived. Anthony Flynn's little brother, Caden Flynn, called Lauren and advised that someone had been shot at Skyler's apartment. Lauren then drove to Skyler's apartment, where Lauren discovered Lofton's body. Police arrived shortly thereafter.

¶ 14    Matthew Watson testified that he lived next door to Skyler, defendant, and Mockbee. Watson was familiar with his neighbors and was able to identify them. On April 12, 2022, Watson was at home when he heard crashing and banging next door. Watson observed three males "coming in and out with trash bags of stuff." Between 6 and 7 p.m., Watson also observed three males running out of the apartment next door where Skyler, defendant, and Mockbee lived. Watson identified defendant and Mockbee as two individuals he observed running out of the apartment on that date. Watson observed defendant run to a "gold Jeep" and Mockbee run to "the dark colored Malibu." Watson also observed a "scrawny" white male with glasses run to a minivan. The State played a video for the jury that was captured by a neighbor and displayed the parking lot area of the apartment complex. The video corroborated Watson's testimony regarding three individuals running to cars and leaving the apartment complex at 6:15 p.m. A couple hours after Watson

4

observed the three males running from the apartment, Watson heard Lauren scream next door. Watson went next door and saw Lofton's body.

¶ 15    Tranetta Woods was the next witness for the State. Woods lived in Champaign, Illinois on April 12, 2022. She was also in a relationship with defendant's uncle, Sylvester Moore, on that date. At that time, Moore drove a gold Dodge Nitro. At approximately 8 p.m. on April 12, 2022, Moore pulled his car into the garage and entered Woods's home with defendant. Woods did not know why Moore and defendant came to her home. Woods claimed that Skyler arrived at Woods's home 20 or 30 minutes later. Woods viewed the surveillance footage of the apartment complex and identified Moore's gold Dodge Nitro leaving the apartment complex around 6:15 p.m., which was around the time Lofton was killed.

¶ 16    Woods testified that the next day she observed defendant on his phone reading about "a Rantoul killing." Woods heard defendant state that he "left that boy on a bed of laundry." Defendant and Skyler stayed at Woods's house for two days. In that time, Woods observed defendant with two guns. Woods learned that "they got into something in a[n] apartment, an argument with a guy in a[n] apartment." Woods overheard defendant state that "they were going to take the gun to their cousin, P.J.'s, house." When the State asked Woods if she eventually directed defendant to leave her home, she responded, "Yes. I asked them to leave because [defendant] wanted to attack his, his child's mother and—", and defense counsel objected. When the State cautioned that Woods could not say what someone else was thinking, Woods stated, "Well, I saw him verbally abusing his child's mother, telling her that he was gonna beat her ass, and I told him that no woman in my house will be treated that way."

¶ 17    The State then called Anthony Flynn as its witness. Flynn was serving a prison sentence for an unrelated possession of a weapon offense. Flynn acknowledged that he did not want to

testify at trial and acknowledged that he had been granted immunity in exchange for his testimony at trial regarding Lofton's death. Flynn claimed that Lofton was one of his best friends. Flynn drove Lofton to Skyler and defendant's apartment on April 12, 2022, in Flynn's GMC Acadia.

¶ 18    Flynn testified that he and Lofton went to the apartment to help Mockbee move out. Flynn claimed that they were packing Mockbee's belongings when Mockbee arrived. Mockbee then began taking his belongings to his blue Chevy Impala. Defendant arrived at some point and appeared angry. Defendant began throwing furniture, cabinets, and clothes around the apartment. Lofton became angry with defendant and told defendant to stop. Lofton confronted defendant near the doorway. Lofton then touched defendant, and defendant turned around and shot Lofton in the face. Flynn was standing at the top of the stairs looking down towards the doorway when the shooting occurred. Flynn described defendant's gun as "big, tan, [with] an extended clip." Flynn denied that Lofton was armed. Lofton fell to the ground and did not move after he was shot. Flynn, along with defendant and Mockbee, ran to the parking lot and left. Flynn recalled that defendant ran to a gold sport utility vehicle (SUV).

¶ 19    Flynn viewed the surveillance footage of the apartment complex and identified defendant and Mockbee arriving at the apartment complex in Mockbee's car at 6:01 p.m. At 6:06 p.m., the footage depicted Flynn, Lofton, and Mockbee moving bags to the cars. At 6:15 p.m., the footage depicted Flynn, Mockbee, and defendant running to their respective cars.

¶ 20    James Barnett, a detective employed by the Rantoul Police Department, testified for the State. Detective Barnett was involved in the investigation of Lofton's death. Detective Barnett spoke with Lauren, Lofton's girlfriend, while conducting his investigation. Lauren provided Detective Barnett with several Facebook accounts to assist in the investigation. Detective Barnett "sent a search warrant to Facebook to retrieve data from those accounts for a certain time period,

from right before the murder until the end of July." The State then requested that the Facebook data be admitted into evidence and that the data be shown to the jury through Detective Barnett. The trial court granted the State's requests.

¶ 21     The State then questioned Detective Barnett regarding the information contained in the data he received from Facebook. Detective Barnett noted that defendant's Facebook account, Que OnGo, was first registered on November 1, 2018, and that the account was deactivated on April 13, 2022. The account was reactivated on April 21, 2022. Detective Barnett learned that defendant had another Facebook account, Bobby Brown, which was activated on April 14, 2022. Detective Barnett learned that both Facebook accounts belonged to defendant. In reviewing the Facebook records, Detective Barnett learned that the Que OnGo and Bobby Brown accounts were linked to one phone, an Android device.

¶ 22     Detective Barnett then testified regarding the messages and phone calls that were sent and received from defendant's Facebook accounts.[1] Defendant, using his Que OnGo account, exchanged messages with Lofton, or "Vello Macc," at approximately 7 p.m. on April 11, 2022. After Lofton tried to call defendant and could not reach him, Lofton sent defendant a message that stated, "I'm give you to the AM getcho shit." Detective Barnett testified that defendant responded, "quit text, we're gonna crash or gon crash." Lofton then replied, "U the only one dats gonna crash little bro."

¶ 23     Detective Barnett testified that defendant next interacted with the "Skai Michelle" Facebook account, which belonged to Skyler Henley. Detective Barnett noted that after receiving the messages from Lofton on April 11, 2022, defendant called Skyler at approximately 3 a.m. on

---

[1]We note that while reading the Facebook messages aloud to the jury, Detective Barnett occasionally testified to his interpretation of acronyms or slang terms contained in the messages.

April 12, 2022. Shortly thereafter, Skyler sent defendant a message that stated, "I don't support nobody shooting at or trying to kill anybody unless it ain't a life-or-death situation." A minute later, Skyler sent a message that stated, "You such a hot head a MF, so meaning mother fucker, beat yo ass you gon turn around try to kill 'em. That's not proving shit chop it up as a L, loss, and grow from it."

¶ 24    Detective Barnett testified that defendant next attempted to call Skyler on Facebook at approximately 6 p.m. on April 12, 2022, but she missed his call. Detective Barnett confirmed that defendant made this phone call close in time to Lofton's murder. Detective Barnett also confirmed that Skyler then sent defendant a message that stated, "my bad I wasn't on FB." Approximately two hours later, Skyler sent defendant a message that stated, "what Christina TB, which would—should mean talking about, what's going on." Detective Barnett clarified that Skyler sent this message after Lofton's murder. Skyler then missed a "video chat" call from defendant. Skyler and defendant then had a brief phone conversation.

¶ 25    Detective Barnett also testified that defendant's Que OnGo account interacted with a Facebook account called "Sylvester Moore" around the time of Lofton's murder. At 5:14 p.m., Sylvester Moore called the Que OnGo account. Sylvester Moore then sent defendant a message that stated, "I'm out here." Defendant responded, "ight." Detective Barnett testified that there was a phone call between defendant and Sylvester Moore at 6:13 p.m. on April 12, 2022, which was around the time the murder occurred. The next communication between defendant and Sylvester Moore occurred on April 23, 2022. Detective Barnett was able to confirm that Sylvester Moore drove a Dodge Nitro SUV.

¶ 26    Detective Barnett next testified regarding the messages and phone calls relating to the "Bobby Brown" Facebook account that defendant activated after Lofton's murder. According to

Detective Barnett, defendant used the Bobby Brown account to send messages to Skyler at approximately 2 p.m. on April 14, 2022. Defendant first attempted to call Skyler. He then sent her a message that stated, "is you okay baby," followed by a message that stated, "I need to know." Skyler replied, "yes but why." Skyler then sent separate messages that stated, "why did you do that" and "like I don't understand, and then TS, this shit, not gonna ever end." Detective Barnett confirmed that defendant was not responding to or denying Skyler's messages. Skyler then sent a message that stated, "they gonna take everybody," followed by a message that stated, "you just made it so I had to just sit there." Defendant asked Skyler if he could "come grab [her]." Skyler responded, "I don't know if it's safe bro I'm worried." Skyler then sent a message that stated, "they deep ASF, meaning they deep as fuck," followed by a message that stated, "like I don't mean how many you think you got they got way more" and "they everywhere." Detective Barnett confirmed that these messages were exchanged after Lofton's murder.

¶ 27    During the same exchange, Skyler sent defendant a message that stated, "and who you think they looking for cuz where they think Imma gonna—they think Imma go." Defendant responded, "I know Imma get you so they don't try you." Skyler responded, "see stop talking like give this shit up." Skyler then sent a message that stated, "I understand you angry but had you listened to me we wouldn't be in this," followed by a message that stated, "control yo fucking anger bro." Skyler then sent a message that stated, "and then you listening to people scared of him feed you lies I know why you really did it." Defendant responded, "I know and I love you." Detective Barnett confirmed that defendant did not deny any of Skyler's messages.

¶ 28    Detective Barnett testified that, during the same exchange, Skyler sent defendant a message that stated, "he wasn't tryna set you up he was trying to show you I don't deserve TS, this shit, you putting me through." Defendant responded, "stop texting like that." Skyler then stated, "I'm

9

deleting everything as I'm send it I'm not stupid." Defendant then advised Skyler, "FB, so Facebook, keeps it." Skyler then sent defendant a message that stated, "and I still love you, and then I'm not sure what this NMW would mean, but it says, and I still love you I just don't understand TS, this shit, bro." Defendant then directed Skyler to "talk code, then IK would mean I know how to read it." Defendant next sent Skyler a message that stated, "I love you too plz be safe til I come get you."

¶ 29 Detective Barnett testified that defendant's Bobby Brown account also interacted with Mockbee from April 14, 2022, to April 24, 2022. Detective Barnett noted that defendant and Mockbee exchanged multiple calls during this timeframe.

¶ 30 Detective Barnett testified regarding one additional exchange between defendant and Skyler that occurred approximately two weeks before defendant's arrest in July 2022. Skyler sent defendant a message that stated, "and tray weird ass be watching me and my niece and nephew told me today they momma said she I think I had something to do with Vello getting killed and I'm just covering it up so I'm leaving before sun, something, happen to me." Skyler then sent a message that stated, "everybody out to get me cuz yo BS, meaning bullshit." Skyler's message went on to state, "Think about that while you leaving me out here to deal with everything myself before you try to get mad about how I'm acting. I'm alone in this world and have been my whole life." Defendant responded, "stop text with goofy shit."

¶ 31 Ryan Snyder, a lieutenant of support services for the Champaign County Sheriff's Department, next testified for the State. Snyder's job duties included monitoring the jail phone system. A recording of the first phone call defendant made from jail was played for the jury. During the phone call, defendant advised his brother to "listen good." Defendant then advised his brother to call his mother and tell her his phone was under her seat. When his brother responded that they

10

already had his phone, defendant responded, "Nah ***." Defendant's brother then stated, "Oh, yeah, yeah, yeah, yeah." Defendant later directed his brother to give his phone to P.J.

¶ 32    After the State rested its case, the defense called Mockbee to testify. At the time of defendant's trial, Mockbee was 20 years old and serving a five-year sentence for possession of a weapon by a felon. Mockbee was previously convicted of unlawful use of a weapon in 2019. Mockbee also had a juvenile conviction for residential burglary and contempt of court.

¶ 33    Mockbee testified that he was defendant's cousin and had known defendant his entire life. Mockbee had only known Lofton for five months before Lofton's death. Mockbee was present at the apartment when Lofton was shot. Mockbee claimed he drove to the apartment with a person named "Jay" prior to the shooting. Mockbee claimed he gave Jay a ride to the apartment complex and that Jay did not come inside the apartment where Lofton was shot. Flynn and Lofton were also at the apartment. According to Mockbee, defendant was not at the apartment. When asked what happened at the apartment, Mockbee responded, "We was gathering my belongings and stuff, and I was coming down the stairs, and Anthony [Flynn] was coming down before me, and then Anthony shot him." Mockbee was standing approximately four feet away when Flynn shot Lofton. Mockbee could not recall what kind of gun Flynn used to shoot Lofton but recalled that Flynn only shot Lofton once. Mockbee explained that, prior to the shooting, "they got into a little shoving match, and then, next thing [Mockbee] [knew], [Flynn] upped his gun and shot him." Mockbee and Flynn then ran to their vehicles and left the apartment complex. Mockbee testified that his trial testimony was consistent with a statement he provided to Detective Barnett.

¶ 34    On cross-examination, Mockbee testified that everything had been calm in the apartment prior to Flynn and Lofton shoving each other. Mockbee denied that anyone threw anything in the apartment. Mockbee claimed that the apartment was "pretty messy." Mockbee explained that

11

defendant had been kicked out of the apartment a week before the shooting. According to Mockbee, defendant was not allowed at the apartment. Mockbee came to the apartment to gather his own belongings, as well as defendant's belongings. Flynn and Lofton were at the apartment before Mockbee arrived. Mockbee acknowledged that when he spoke with Detective Barnett in September 2022 Mockbee denied that he was present at the apartment when the shooting occurred. Mockbee claimed that he provided a statement to Detective Barnett that was consistent with his trial testimony regarding the shooting in June 2023. Mockbee acknowledged that he did not mention Jay when he provided a statement to Detective Barnett. Mockbee admitted that he knew Sylvester Moore but claimed Moore did not have a car. Mockbee denied that he ever saw defendant with a gun.

¶ 35    During closing arguments, the State asserted that defendant and Lofton "clearly didn't like each other." The State added that Lofton and defendant had prior disputes, and that Lofton stood up to defendant and "injured [defendant's] pride, his ego." The State also added that "defendant couldn't handle that, couldn't handle his anger." The State noted that Lofton and defendant exchanged hostile messages on Facebook the night before the murder. The State also noted that defendant called Skyler after receiving Lofton's messages. The State then read aloud several Facebook messages Skyler sent defendant prior to Lofton's murder. The State additionally read aloud the Facebook messages Skyler and defendant exchanged after Lofton's murder.

¶ 36    The State also discussed defendant's first jail phone call to his brother, positing that defendant was talking in code. The State asserted that defendant's reference to a "phone" under his mother's seat was code for gun. The State further noted that defendant's insistence to get the "phone" to P.J. during the phone call was consistent with Woods's testimony regarding defendant taking a gun to someone named P.J. The State asserted that if the jury "look[ed] at the text

messages, the video, everything you've seen here today, it can lead to only one conclusion, that [defendant] is guilty."

¶ 37    Following deliberations, the jury found defendant guilty of first degree murder. The jury also found that defendant personally discharged a firearm that proximately caused death to another person.

¶ 38    On June 28, 2023, defense counsel filed a posttrial motion, alleging, *inter alia*, that the trial court erred by admitting "the 'Facebook' information [ ] without adequate foundation connecting it to the Defendant." The trial court ultimately denied defendant's motion.

¶ 39    On August 25, 2023, the trial court held a sentencing hearing. At the sentencing hearing, defense counsel asserted that "[c]onsidering the defendant's age, the 45-year sentence is an adequate sentence, more than enough time for this crime."

¶ 40    After defendant made a statement in allocution, the trial court addressed the statutory and non-statutory factors in aggravation and mitigation. Prior to announcing its sentence, the court stated:

> "The defendant himself is extremely young. He's 19 years of age *** as of today. He was even younger at the time of the offense. I do consider that at that age a person's brains are not fully developed. Young adults are still evolving into the person they will ultimately be. A young person at that age is likely particularly susceptible to peer pressure, impulsive acts and rash behavior. I am considering all of those factors, as I must, for a defendant at this age in determining an appropriate sentence."

¶ 41    After considering the relevant factors, the trial court sentenced defendant to 58 years in prison, to be followed by 3 years of MSR. The court clarified that it sentenced defendant to 33 years "plus the 25-year enhancement." Defendant subsequently filed a timely notice of appeal.

13

¶ 42                                    II. ANALYSIS

¶ 43    On appeal, defendant argues that he received ineffective assistance of counsel at both trial and sentencing. First, he argues that defense counsel was ineffective at trial, where counsel failed to object to inadmissible hearsay statements of a non-testifying witness elicited through Facebook messages and to irrelevant and prejudicial witness testimony. Second, he argues that defense counsel was ineffective at sentencing, where counsel failed to raise an as-applied challenge to defendant's mandatory *de facto* life sentence under the proportionate penalties clause of the Illinois Constitution. We address these arguments in turn.

¶ 44                    A. Facebook Messages and Witness Testimony

¶ 45    Defendant first argues that defense counsel was ineffective for failing to object to the content of the Facebook messages, elicited through Detective Barnett's testimony, exchanged between defendant and Skyler and to certain portions of Woods's testimony. We disagree.

¶ 46    We review *de novo* a claim of ineffective assistance of counsel. *People v. Tayborn*, 2016 IL App (3d) 130594, ¶ 16. "A claim of ineffective assistance of counsel is evaluated under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984)." *People v. Henderson*, 2013 IL 114040, ¶ 11. "To prevail on a claim of ineffective assistance of counsel, a defendant must show both that (1) counsel's performance was deficient and (2) the deficient performance prejudiced defendant such that he was deprived of a fair trial." *People v. Cross*, 2022 IL 127907, ¶ 19. "The failure to establish either prong is fatal." *People v. Keys*, 2023 IL App (4th) 210630, ¶ 59. In other words, "failure to establish prejudice is a sufficient basis to deny a claim of ineffective assistance of counsel." *People v. Drew*, 2024 IL App (5th) 240697, ¶ 34. "[I]f it is easier to dispose of an ineffective-assistance claim on the ground that it lacks a showing of sufficient prejudice, a court may proceed directly to [the] prejudice prong and need not determine

14

whether counsel's performance was deficient." *People v. Johnson*, 2021 IL 126291, ¶ 53 (citing *People v. Givens*, 237 Ill. 2d 311, 331 (2010)).

¶ 47     To establish prejudice under *Strickland*, "a defendant must establish 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Albanese*, 104 Ill. 2d 504, 525 (1984) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

¶ 48     Here, we need not consider whether defense counsel's performance was deficient because defendant failed to establish prejudice. Specifically, defendant failed to demonstrate that there was a reasonable probability that the result of the proceeding would have been different if the evidence at issue had not been admitted at trial. In our view, the evidence against defendant was overwhelming as to his guilt without the Facebook messages he exchanged with Skyler and the challenged portion of Woods's testimony.

¶ 49     Lauren Henley testified that Flynn and Lofton were friends. She also testified that defendant and Lofton did not get along and that she witnessed a physical altercation between the two men in December 2021. Lauren also testified that her mother evicted defendant and Mockbee from the apartment they shared with Skyler.

¶ 50     Defendant exchanged messages with Lofton on Facebook the day before Lofton's murder. During the exchange, Lofton advised defendant to remove his belongings from the apartment by the morning.[2]

---

[2]Defendant's brief includes no specific argument that defense counsel was ineffective for failing to object to the Facebook messages exchanged between defendant and Lofton.

¶ 51    Flynn testified that he and Lofton, who was one of his best friends, went to the apartment to assist Mockbee in moving out of the apartment. Flynn testified that defendant came to the apartment at some point. Flynn testified that the surveillance footage of the apartment complex depicted defendant and Mockbee arriving at the apartment complex together in Mockbee's car at 6:01 p.m. Flynn testified that the footage depicted Flynn, Lofton, and Mockbee taking bags to cars at 6:06 p.m. Flynn testified that defendant was angry and began throwing items around the apartment, which angered Lofton. Flynn testified that a confrontation occurred between defendant and Lofton near the entryway of the apartment. Flynn testified that defendant shot Lofton in the face during the confrontation. Flynn testified that he, Mockbee, and defendant all fled after the shooting. Flynn testified that the surveillance footage depicted Flynn, defendant, and Mockbee running to their respective cars at 6:15 p.m. Flynn recalled that defendant left in a gold SUV.

¶ 52    Flynn's testimony was consistent with Watson's testimony. Watson testified that he observed defendant and Mockbee at the apartment at the time of the shooting. Watson was familiar with defendant and Mockbee because he was their neighbor. Watson heard loud crashing and banging in the apartment. Watson observed three males carrying bags to cars in the parking lot. Watson next observed three males, including defendant and Mockbee, running from the apartment. Watson observed defendant run to a "gold Jeep." The video footage of the apartment complex corroborated Flynn's and Watson's testimonies regarding the events that took place at the apartment on April 12, 2022.

¶ 53    Tranetta Woods testified that defendant and Moore arrived at her home in Moore's gold SUV at approximately 8 p.m. on April 12, 2022—shortly after Lofton's murder. Woods identified the gold vehicle depicted in the footage of the apartment complex as the vehicle owned by Moore. Woods also observed defendant viewing a news article on his phone about a Rantoul killing.

16

Woods testified that she heard defendant state that he "left that boy on a bed of laundry." Woods's testimony in this regard was consistent with a crime-scene photograph that depicted Lofton's body lying on a pile of clothing. Woods additionally observed defendant in possession of guns and heard him state that he planned to take a gun to P.J. This was consistent with the jail phone call where defendant told his brother to take his "phone" to P.J.[3]

¶ 54    We acknowledge Mockbee's testimony that defendant was not present at the apartment when Lofton was killed and that Flynn shot Lofton. However, Mockbee was defendant's cousin and Mockbee's testimony was contradicted by, or inconsistent with, other evidence in nearly every aspect. Notably, Mockbee's version of events is inconsistent with the testimonies of Lauren and Flynn that Lofton and Flynn were good friends. Mockbee's claim that defendant was not at the apartment complex when Lofton was shot was contradicted by Flynn's testimony that defendant was at the apartment at the time of the shooting. Mockbee's testimony was also contradicted by the testimony of Watson, who was an uninterested third party, that defendant was at the apartment at the time of the shooting. The surveillance footage depicted Mockbee arriving at the apartment with another individual. Mockbee testified that this individual was named Jay; however, Flynn testified that this individual was defendant. Mockbee's testimony that everyone was calm in the apartment prior to the shooting was contradicted by Flynn's testimony that defendant was angry and began throwing items around the apartment. Flynn's testimony in this regard was corroborated by Watson's testimony that he heard banging and crashing in the apartment, as well as the crime scene photographs depicting overturned furniture and personal items strewn about the apartment. Mockbee's testimony that only he and Flynn fled the apartment after Lofton's murder was

---

[3]Defendant asserts that defense counsel was ineffective for failing to object to certain portions of Woods's testimony; however, we have not considered those portions in our analysis here.

inconsistent with the testimonies of Flynn and Watson, as well as the surveillance footage. Both Flynn and Watson testified that three men, including defendant, fled the apartment. Watson and Flynn further observed defendant running to a gold SUV. Flynn and Watson's testimonies were corroborated by the footage from the apartment complex, which depicted three men running from the apartment. Woods also identified Moore's gold Dodge Nitro leaving the apartment around the time of the shooting. Woods and Detective Barnett testified that Moore drove a gold Dodge Nitro, which was inconsistent with Mockbee's testimony that Moore did not own a vehicle. Lastly, Woods's testimony that she observed defendant with a gun shortly after Lofton's murder was inconsistent with Mockbee's testimony that he had never observed defendant with a gun.

¶ 55    Based on our review of the evidence, we conclude that defendant has failed to demonstrate that there is a reasonable probability that the result of the proceeding would have been different had the content of the Facebook messages between defendant and Skyler and certain portions of Woods's testimony not been admitted into evidence at trial. This is especially true where Flynn testified that he witnessed defendant shoot Lofton in the face and Watson observed defendant fleeing from the apartment around the time Lofton was shot. While Mockbee testified that defendant was not present at the apartment at the time of the shooting, the jury heard all the evidence and was charged with the obligation of resolving any inconsistencies in the testimony. *People v. Hunley*, 313 Ill. App. 3d 16, 20-21 (2000). This court will not reweigh the evidence or interfere with the conclusions reached by the finder of fact regarding resolution of the conflicting testimony unless the jury's conclusion was unreasonable and not based on the evidence. *Id.* at 21. Accordingly, defendant cannot prove prejudice and his claim of ineffective assistance of counsel fails.

18

¶ 56 We acknowledge that the State referenced the Facebook messages exchanged between defendant and Skyler in closing argument. However, the jury was properly instructed that closing arguments were not evidence. Moreover, as outlined above, the other evidence presented at the trial overwhelmingly established defendant's guilt. Thus, in our view, defendant failed to show that there was a reasonable probability that the State's reference to the Facebook messages during closing argument changed the result of the proceeding. Accordingly, the State's reference to the Facebook messages during closing argument also did not prejudice defendant.

¶ 57                                      B. Sentence

¶ 58 Defendant next argues defense counsel was ineffective for failing to raise an as-applied challenge to his mandatory *de facto* life sentence under the proportionate penalties clause of the Illinois Constitution. We disagree.

¶ 59 As noted above, defendant must establish both prongs of the *Strickland* test in order to prevail on a claim of ineffective assistance of counsel (*Keys*, 2023 IL App (4th) 210630, ¶ 59), and a defendant's "failure to establish prejudice is a sufficient basis to deny a claim of ineffective assistance of counsel." *Drew*, 2024 IL App (5th) 240697, ¶ 34. "To succeed on a claim of ineffectiveness of counsel at sentencing, defendant must show that counsel's performance was below minimal professional standards and that a reasonable probability exists that the sentence was affected." *People v. Orange*, 168 Ill. 2d 138, 168 (1995). In order to establish prejudice in the context of sentencing, the defendant must demonstrate a reasonable probability that counsel's deficient performance affected the sentence. See *People v. Billups*, 2016 IL App (1st) 134006, ¶ 16.

¶ 60 With this in mind, we consider defendant's argument that defense counsel was ineffective for failing to raise an as-applied proportionate penalties challenge to his mandatory *de facto* life

19

sentence. Defendant asserts that he was only 18 years old at the time of the offense, and that he was subjected to a sentence of 58 years—a sentence 13 years above the minimum sentence of 45 years. Defendant maintains that defense counsel was ineffective, where he failed to advocate for defendant and argue that the sentencing range, as applied to defendant, violated the proportionate penalties clause. Defendant claims that counsel failed to cite the relevant brain research and declined to present evidence in mitigation. Defendant claims there is a reasonable probability that the trial court would have imposed a lower sentence if counsel had explained the brain research and its applicability to defendant's case.

¶ 61 "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. A penalty violates the proportionate penalties clause if it is so severe that it is cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community. *People v. Hilliard*, 2023 IL 128186, ¶ 20.

¶ 62 The United States Supreme Court has concluded that "that children are constitutionally different from adults for purposes of sentencing" due to their "diminished culpability and greater prospects for reform." *Miller v. Alabama*, 567 U.S. 460, 471 (2012). In *Miller*, the Supreme Court held that the eighth amendment prohibited sentences of mandatory life in prison without parole for juveniles who committed homicides. *Id.* at 489. More recently, the Supreme Court held that *Miller* did not prohibit life sentences for juveniles who committed homicide offenses, but clarified that the sentencing court must have discretion to consider youth and its attendant circumstances before imposing a life without parole sentence. *Jones v. Mississippi*, 593 U.S. 98, 109 (2021). Our legislature has codified the relevant factors (*Miller* factors) relating to youth and its attendant

20

circumstances in section 5-4.5-105 of the Unified Code of Corrections (730 ILCS 5/5-4.5-105 (West 2022)).

¶ 63    However, our supreme court has recognized that the *Miller* line of cases only applies to juveniles—persons under the age of 18. *People v. Spencer*, 2025 IL 130015, ¶ 32. Despite this, our supreme court has indicated that defendants between the ages of 18 and 19 are not entirely foreclosed from asserting an "as-applied *Miller*" claim. See *People v. Clark*, 2023 IL 127273, ¶ 87 ("this court has not foreclosed 'emerging adult' defendants between 18 and 19 years old from raising as-applied proportionate penalties clause challenges to life sentences based on the evolving science on juvenile maturity and brain development.") (citing *People v. Thompson*, 2015 IL 118151, ¶¶ 1, 43-44, and *People v. Harris*, 2018 IL 121932, ¶¶ 1, 48)).

¶ 64    Our supreme court has held that *Miller* also applies to *de facto* life sentences—a prison sentence of more than 40 years. *People v. Buffer*, 2019 IL 122327, ¶¶ 27, 40. Thus, a sentencing court must consider the juvenile's youth and attendant circumstances before it can sentence a juvenile to more than 40 years. *Id.* ¶ 42.

¶ 65    Here, defendant asserts that he, as a young adult offender, is entitled to *Miller* protections because he is serving a *de facto* life sentence. However, section 5-4.5-115 of the Unified Code of Corrections (730 ILCS 5/5-4.5-115 (West 2022)) remedies any violation of *Miller*. Notably, section 5-4.5-115(b) of the Unified Code of Corrections (*id.* § 5-4.5-115(b)) provides that any person who was under 21 years old at the time of the commission of the offense and was sentenced on or after June 1, 2019, is eligible for parole after serving 20 years if he committed first degree murder and did not receive a sentence of natural life imprisonment. Our supreme court recently concluded that the parole statute provides "a meaningful opportunity to obtain release before ***

21

40 years in prison," and that a defendant subject to this statute was not given a *de facto* life sentence for *Miller* purposes. *Spencer*, 2025 IL 130015, ¶ 40.

¶ 66    As noted, defendant, here, was 18 years old when he committed the offense, and he was sentenced after June 1, 2019. Accordingly, he may petition for parole 20 years into his sentence (730 ILCS 5/5-4.5-115(b) (West 2018)), and he was not given a *de facto* life sentence as contemplated by *Miller*. Thus, we conclude that defendant's 58-year sentence in this case was not a *de facto* life sentence, where the parole statute afforded him "a meaningful opportunity for release based on his maturity and rehabilitation before a *de facto* life sentence of over 40 years' imprisonment." *People v. Beck*, 2021 IL App (5th) 200252, ¶ 26.

¶ 67    We acknowledge our supreme court's decision in *Spencer* clarified that the inapplicability of *Miller* to a defendant does not preclude a proportionate penalties claim. *Spencer*, 2025 IL 130015, ¶ 42. "A defendant may challenge a sentence of any length" under the proportionate penalties clause. *Id.* ¶ 43. Our supreme court recognized that this claim could possibly rely on "the evolving science regarding juvenile maturity and brain development." *Id.* However, because "[a]ll as-applied constitutional challenges are, by definition, reliant on the application of the law to the specific facts and circumstances alleged by the challenger," "it is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review." (Internal quotation marks omitted.) *Id.* ¶ 44.

¶ 68    Here, defendant fails to establish that he was prejudiced by defense counsel's failure to raise an as-applied proportionate penalties challenge. While defense counsel did not present any evidence in mitigation, defense counsel did argue that the trial court should consider defendant's age in sentencing defendant. Moreover, before imposing its sentence, the court stated as follows:

"The defendant himself is extremely young. He's 19 years of age *** as of today. He was even younger at the time of the offense. I do consider that at that age a person's brains are not fully developed. Young adults are still evolving into the person they will ultimately be. A young person at that age is likely particularly susceptible to peer pressure, impulsive acts and rash behavior. I am considering all of those factors, as I must, for a defendant at this age in determining an appropriate sentence."

Accordingly, although defense counsel did not make these specific arguments at the sentencing hearing relative to the *Miller* factors, as codified by our statute, the record demonstrates that the court did consider defendant's youth and its attendant characteristics, including the evolving science on juvenile maturity and brain development in imposing its sentence. Therefore, defendant cannot demonstrate that counsel's failure to raise these specific arguments prejudiced the sentencing hearing or negatively affected his sentence. Consequently, defendant cannot prove prejudice and his claim of ineffective assistance of counsel fails.

¶ 69                               III. CONCLUSION

¶ 70    For the foregoing reasons, we affirm the judgment of the circuit court of Champaign County.


¶ 71    Affirmed.